**MARTIN EXPLORATION MANAGEMENT COMPANY; Colorado Energy Corporation; Phillips Petroleum Company; Phillips Oil Company; Exxon Corporation; Shell Offshore, Inc.; Shell Western E & P, Inc.; Independent Oil & Gas Association of West Virginia, and Amoco Production Company, Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

and

Arco Oil & Gas Company, et al., Intervenors.

Nos. 84–2756, 84–2759, 84–2760, 85–1172, 85–1250, 85–1254, 85–1257, 85–1443, 85–1452, 85–1255 and 85–1256.

United States Court of Appeals, Tenth Circuit.

March 9, 1987.

As Modified on Denial of Rehearing and Rehearing En Banc May 1, 1987.

Bruce A. Hubbard, Kirkland & Ellis, Denver, Colo., Stephen A. Herman, Allen N. Dixon, III, Kirkland & Ellis, Washington, D.C., and James A. Henshall, Jr., General Counsel, Martin Exploration Management Co. and Colorado Energy Corp., for petitioners Martin Exploration Management Co. and Colorado Energy Corp.

Larry Pain (Thomas L. Barton, Thomas M. Blume, Phillips Petroleum Legal Dept., Denver, Colo., John L. Williford, C.J. Roberts, Jennifer A. Cates; Phillips Petroleum Legal Dept., Bartlesville, Okl., on the briefs), Phillips Petroleum Legal Dept., Bartlesville, Okl., for petitioners Phillips Petroleum Co. and Phillips Oil Co.

Edmunds Travis, Jr., Douglas W. Rasch, Exxon Corp., Houston, Tex., for petitioner Exxon Corp.

Thomas G. Johnson (Eugene V. Callaway, Shell Corp., Houston, Tex., on the briefs), Shell Corp., Houston, Tex., for petitioners Shell Offshore, Inc. and Shell Western E & P, Inc.

R. Gordon Gooch, Dennis J. Moss, J. Patrick Berry, Baker & Botts, Washington,

D.C., for petitioner and intervenor Independent Oil & Gas Ass'n of West Virginia.

Jon L. Brunenkant, Grove, Jaskiewicz, Gilliam & Cobert, Washington, D.C., William T. Benham, Amoco Production Co., Chicago, Ill., for petitioner and intervenor Amoco Production Co.

John H. Conway (Leslie J. Lawner, William H. Satterfield and Jerome M. Feit, F.E.R.C., Washington, D.C., on the briefs), F.E.R.C., Washington, D.C., for respondent F.E.R.C.

Michael G. Maloney, Harris S. Wood, Arco Oil and Gas Co., Dallas, Tex., for intervenor Arco Oil and Gas Co.

M. Howard Petricoff, W. Jonathan Airey, Vorys, Sater, Seymour and Pease, Columbus, Ohio, for intervenor Ohio Oil and Gas Ass'n.

James B. Atkin, Norma J. Rosner, Pillsbury, Madison & Sutro, Washington, D.C., David R. Stevenson, Anthony V. Sorrentino, Gulf Oil Corp., Houston, Tex., for intervenor Gulf Oil Corp., successor to Chevron, U.S.A., Inc.

Lois Ellen Gold, Albert Sylvia, III, Union Oil Co. of California, Los Angeles, Cal., for intervenor Union Oil Co. of California.

Constance D. Coleman, Champlin Petroleum Co., Fort Worth, Tex., for intervenor Champlin Petroleum Co.

William Neal Powers, Jr., Everard A. Marseglia, Jr., John McDonald, Charles Suffling, Butler & Binion, Houston, Tex., and John B. Chapman, Mark C. Shaprow, Pennzoil Co., Houston, Tex., for intervenors Pennzoil Co., Pennzoil Oil & Gas, Inc. and Pennzoil Producing Co.

Ronald D. Hurst, Paul W. Hicks, Placid Oil Co., Dallas, Tex., for intervenor Placid Oil Co.

Terrence J. Collins, Robert Ballentine, Margaret L. Bollinger, Melissa E. Fields, Tennessee Gas Pipeline Co., Houston, Tex., for intervenor Tennessee Gas Pipeline Co., a div. of Tenneco, Inc.

Patrick G. Golden, Steven F. Greenwald, Shirley A. Woo, Law Dept., Pacific Gas and Elec. Co., San Francisco, Cal., for intervenor Pacific Gas and Elec. Co.

C. Burnett Dunn, David E. Crawford; Huffman, Arrington, Kihle, Gaberino & Dunn, Tulsa, Okl., and William I. Harkaway, Douglas M. Canter, McCarthy, Sweeney & Harkaway, P.C., Washington, D.C., for intervenor Oklahoma Natural Gas Co., a div. of ONEOK, Inc.

Frederick Moring, Herbert J. Martin, Crowell & Moring, Washington, D.C., for intervenor Associated Gas Distributors.

Richard A. Solomon, David D'Alessandro, Wilner & Scheiner, Washington, D.C., and David E. Blabey, General Counsel, Public Service Com'n of the State of New York, Albany, N.Y., for intervenor Public Service Com'n of State of N.Y.

Douglas K. Porter, Los Angeles, Cal., for intervenor Pacific Lighting Gas Supply Co. and Southern California Gas Co.

Stephen E. Williams, Georgia B. Carter, Consolidated Gas Transmission Corp., Clarksburg, W.V., and Mark G. Magnuson, Consol. Natural Gas Service Co., Inc., Washington, D.C., for intervenor Consol. Natural Gas Service Co., Inc.

Raymond N. Shibley, Brian D. O'Neill, Patrick J. Whittle, LeBoeuf, Lamb, Leiby & MacRae, Washington, D.C., for intervenor Panhandle Eastern Pipe Line Co.

Philip D. Elias, Michael L. Pate, Carmen Farrell, Cities Service Oil & Gas Corp., Tulsa, Okl., for intervenor Cities Service Oil & Gas Corp.

Charles H. Shoneman, Bracewell & Patterson, Washington, D.C., for intervenor Grace Petroleum Corp.

Stan L. McLelland, M. Frazier King, Jr., Carman M. Garufy, Valero Transmission Co., San Antonio, Tex., for intervenor Valero Transmission Co.

Walter L. Brignon, Kenneth R. Satterly, BHP Petroleum, Co., Inc., successor to Monsanto Oil Co., Houston, Tex., for intervenor BHP Petroleum, Co., Inc.

Sherrie N. Rutherford, Bolivar Andrews, Richard Kruse, Maelissa R.M. Watson, John Stephen Martin, Texas Eastern Transmission Corp., Houston, Tex., and J. Evans Attwell, Judy M. Johnson, David T. Andril,

Vinson & Elkins, Houston, Tex., for intervenor Texas Eastern Transmission Corp.

Cheryl M. Foley, Transwestern Pipeline Co., Houston, Tex., for intervenor Transwestern Pipeline Co.

James P. Sale, United Gas Pipe Line Co. and United Texas Transmission Co., Houston, Tex., and Donald R. Arnett, P.C., Porter K. Ryan, Brian L. Gennity, Chamberlain, Hrdlicka, White, Johnson & Williams, Houston, Tex., for intervenors United Gas Pipe Line Co. and United Texas Transmission Co.

Michael R. Waller, Reynolds, Allen & Cook, Washington, D.C., and Douglas Field, Texas Gas Transmission Corp., Owensboro, Ky., for intervenor Texas Gas Transmission Corp.

Ralph E. Simon, Jr., Linda Cole McGowan, Transok, Inc., Tulsa, Okl., for intervenor Transok, Inc.

Before BARRETT and TACHA, Circuit Judges, and BROWN *, District Judge.

TACHA, Circuit Judge.

This appeal presents challenges by natural gas producers to the Federal Energy Regulatory Commission (FERC) orders interpreting the statutory mandate in § 121 of the Natural Gas Policy Act of 1978 (NGPA), 15 U.S.C. § 3331, to deregulate certain natural gas prices. For the reasons set forth in this opinion, we affirm the FERC orders in part and reverse in part.

## I.

The NGPA "comprehensively and dramatically changed the method of pricing natural gas produced in the United States." *Public Serv. Comm'n., New York v. Mid-Louisiana Gas Co.*, 463 U.S. 319, 320, 103 S.Ct. 3024, 3026, 77 L.Ed.2d 668 (1983). The purposes of these changes "are rooted in the history of federal natural gas regulation before 1978." *Id.* at 327, 103 S.Ct. at 3029. We therefore begin by examining the history of federal regulation of natural

gas prices and the context in which the Ninety-Fifth Congress adopted the NGPA in 1978.

The first federal regulation of interstate sales of natural gas occurred with the passage of the Natural Gas Act of 1938 (NGA), Pub.L. No. 75–688, 52 Stat. 821 (codified as amended at 15 U.S.C. §§ 717–717w (1976)). "The NGA was enacted in response to reports suggesting that the monopoly power of interstate pipelines was harming consumer welfare." *Mid-Louisiana Gas Co.*, 463 U.S. at 327, 103 S.Ct. at 3029 (footnote omitted). State efforts to combat this problem had failed because they were found to be unconstitutional restrictions on interstate commerce. *E.g., Missouri v. Kansas Natural Gas Co.*, 265 U.S. 298, 44 S.Ct. 544, 68 L.Ed. 1027 (1924). The NGA authorized the Federal Power Commission (FPC)[1] to establish such price ceilings for the sale of interstate gas for resale as were "just and reasonable." 15 U.S.C. § 717c(a). The NGA did not regulate the price of gas sold in intrastate markets.

The FPC struggled to apply this scheme during the next several decades. By the 1970's, however, it became clear that the existing regulatory structure was inadequate. The federally regulated prices for interstate gas sales remained consistently below the unregulated prices for intrastate gas sales. Natural gas producers found it more profitable to commit most of their supplies to the intrastate market. At the same time, consumer demand for gas in the interstate market was artificially high because of the federally imposed ceiling prices. The result was a serious natural gas shortage in the interstate market. *See generally* Breyer and MacAvoy, *The Natural Gas Shortage and the Regulation of Natural Gas Producers*, 86 Harv.L.Rev. 941 (1973). "The NGA and its regulatory history led to a single, overwhelming conclusion: under NGA regulations the domestic supply of natural gas could no longer meet consumer demands in the interstate

---

* The Honorable Wesley E. Brown, District Judge of the District of Kansas, sitting by designation.

1. The FPC was succeeded by FERC pursuant to the Department of Energy Organization Act of 1977, 42 U.S.C. § 7101, et seq., 7134.

market." Note, *Legislative History of the Natural Gas Policy Act: Title I*, 59 Tex.L. Rev. 101, 112 (1980) [hereinafter Note].

Congress repeatedly attempted to remedy this situation during the energy crisis of the 1970's. After several efforts to restructure the federal regulation of natural gas prices had failed, President Carter addressed the problem in his proposed Natural Energy Act in 1977. The President proposed an extension of price controls to the intrastate sale of natural gas and the establishment of a uniform and incentive-based pricing system for new natural gas. The House passed this proposal substantially unaltered. The Senate, however, was badly divided on the issue. Supporters of the House bill were opposed by supporters of the complete deregulation of natural gas prices. Proponents of deregulation believed that market forces would produce an equilibrium between supply and demand if the price of natural gas was not restricted. After a "pitched legislative battle," Note at 114, that included several filibusters, the Senate passed a bill that "would have maintained Natural Gas Act regulation for all gas sold or delivered in interstate commerce before January 1, 1977, and steadily cut back on Commission jurisdiction so that all natural gas sold after January 1, 1982, would have been completely deregulated." *Mid-Louisiana Gas Co.*, 463 U.S. at 331–32, 103 S.Ct. at 3031–32.

The conference committee approved a compromise measure after months of deliberation. *See* H.R.Conf.Rep. No. 95–1752, 95th Cong., 2d Sess. [hereinafter Conf. Rep.], *reprinted in* 1978 U.S.Code Cong. & Admin.News 8983–9041. The committee bill did not adopt either the uniform regulation or the complete deregulation approach in their entirety; rather, the bill was the "careful reconciliation of two strong, but divergent, responses to the natural gas shortage." *Mid-Louisiana Gas. Co.*, 463 U.S. at 331, 103 S.Ct. at 3031. The conference bill was approved by both houses of Congress and signed into law by President Carter on November 9, 1978.

## II.

The NGPA adopted new means to achieve the traditional purposes of the federal regulation of natural gas prices. "The aim of federal regulation remains to assure adequate supplies of natural gas at fair prices, but the NGPA reflects a congressional belief that a new system of natural gas pricing was needed to balance supply and demand." *Transcontinental Gas Pipe Line Corp. v. State Oil and Gas Board of Mississippi*, 474 U.S. 409, 106 S.Ct. 709, 716, 88 L.Ed.2d 732 (1986). The resulting pricing system is an intricate balance of uniform price ceilings, incentive prices, and partial phased deregulation.

The statutory scheme established by the NGPA divides natural gas production into numerous categories that are distinguished by the date that production began from a well or the particular type of drilling involved. Gas in these categories can be broadly classified as "old" gas, "new" gas, or difficult to produce gas. "Old" gas is generally that produced from wells that had been operating before the passage of the NGPA. *See* NGPA § 104, 15 U.S.C. § 3314 (sales of natural gas dedicated to interstate commerce at the time of the passage of the NGPA); NGPA § 105, 15 U.S.C. § 3315 (sales of gas under intrastate contracts existing at the time of the passage of the NGPA); NGPA § 106, 15 U.S.C. § 3316 (sale of gas under rollover contracts). "New" gas is generally that produced from wells that began production after the passage of the NGPA. *See* NGPA § 102, 15 U.S.C. § 3312 (sale of gas from new Outer Continental Shelf leases, new onshore wells, or new onshore reservoirs); NGPA § 103, 15 U.S.C. § 3313 (sale of gas from new onshore production wells). Several methods of production are specifically described in the statute as difficult to produce gas. *See* NGPA § 107, 15 U.S.C. § 3317 (sale of gas produced through particular high-cost methods);[2] NGPA § 108,

---

**2.** High-cost natural gas includes gas "produced under such other conditions as the Commission determines to present extraordinary risks or costs." 15 U.S.C. § 3317(c)(5). FERC has specified tight formation gas as being high-cost natural gas within the meaning of § 107(c)(5). 18

15 U.S.C. § 3318 (sale of stripper well natural gas).[3] The categories are not mutually exclusive: a particular sale may be "dually qualified" within a "new" or "old" gas category and also a difficult to produce category.

The NGPA established ceiling prices for each of these categories of natural gas production. In general, the lowest ceiling prices were for old gas, higher ceiling prices were established for new gas, and the highest ceiling prices were for difficult to produce gas. The purpose of creating different ceilings was to create an incentive to drill for new gas, particularly gas that is costly to produce. Conf.Rep. at 87. Such an incentive was unnecessary for gas that was already being produced at the time the NGPA was enacted. The ceiling prices were set by the statute and designed to increase periodically pursuant to statutory formulas. *See, e.g.,* 15 U.S.C. § 3312(b) (the ceiling price for new gas was $1.75 per million Btu's in April 1977 and was to increase at a set rate above the annual inflation factor).

The price that a producer can receive for the sale of natural gas is limited by these ceiling prices. The relevant category for a particular sale of natural gas is determined by a procedure set out in the statute. NGPA § 503, 15 U.S.C. § 3413. In essence, a producer must apply for a determination that gas comes within a particular category or categories. This determination is usually to be made by an authorized state agency subject to FERC and judicial review. *Id.* The ceiling price can then be determined once the producer has selected and received approval for the applicable category or categories. The ceiling price, however, is not necessarily the price that is charged. The NGPA explicitly provides that the contract price agreed to by the parties is binding as long as it is below the

ceiling price. NGPA § 101(b)(9), 15 U.S.C. § 3311(b)(9).

The ceiling prices established by the NGPA represent the result of the congressional compromise favorable to the advocates of uniform pricing. The deregulation proponents achieved a phased elimination of many, but not all, of those price ceilings. Section 121 eliminates the price ceilings for many categories of natural gas. Certain high-cost natural gas as defined in § 107(c)(1)–(4) was deregulated in 1979. 15 U.S.C. § 3331(b). New natural gas as defined in § 102, new onshore production wells as defined in § 103(c), and some intrastate gas were deregulated on January 1, 1985. 15 U.S.C. § 3331(a). Most natural gas produced from 5,000 feet or less is to be deregulated on July 1, 1987. 15 U.S.C. § 3331(c). *But see* 15 U.S.C. § 3331(d) (certain Alaska natural gas is excluded from deregulation). The NGPA does not speak of the elimination of the ceiling prices for any other categories of gas. In particular, old gas is not deregulated, but it was expected that old gas would account for a decreasing proportion of the sale of natural gas with the passage of time. Pierce, *Natural Gas Regulation, Deregulation, and Contracts,* 68 Va.L.Rev. 63, 89 (1982). And, of particular importance in this case, the NGPA does not include § 107(c)(5) tight formation gas or § 108 stripper well gas on the face of the deregulation provisions of § 121.

### III.

FERC announced a Notice of Proposed Rulemaking on September 13, 1984 to implement the deregulation provisions of § 121 of the NGPA. Deregulation and Other Pricing Changes on January 1, 1985, Under the Natural Gas Policy Act, 49 Fed. Reg. 36,399 (1984). Natural gas producers,

---

C.F.R. § 271.703 (1986). "A 'tight formation' is a sedimentary layer of rock cemented together in a manner that greatly hinders the flow of any gas through the rock.... To stimulate production from these formations, producers must use expensive enhanced recovery techniques." Regulations Covering High-Cost Natural Gas Produced from Tight Formations, 45 Fed.Reg. 56,-034–35 (1980) (footnote omitted).

**3.** A stripper well is a "well which produces such small volume of [gas] that the gross income therefrom provides only a small margin of profit or, in many cases, does not even cover actual cost of production." H. Williams & C. Meyers, *Manual of Oil and Gas Terms* 572 (4th ed. 1976).

pipelines, public utility commissions, consumer groups, and other interested parties filed extensive comments on the proposed rules. FERC then issued an order promulgating final rules interpreting § 121. 49 Fed.Reg. 46,874 (1984). After several parties sought a rehearing, FERC upheld that part of its earlier order relating to dual qualification gas but reversed that part of its earlier order concerning intrastate gas. 49 Fed.Reg. 50,637 (1984). FERC then declined to review its order on rehearing. 50 Fed.Reg. 7,333 (1985). Natural gas producers appeal from both of FERC's conclusions on rehearing. Jurisdiction is established in this court pursuant to the judicial review provisions of the NGPA. 15 U.S.C. § 3416.

We first note our standard of review of FERC interpretations of the NGPA. Our first inquiry is whether "Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984) (footnote omitted). *Accord Office of Consumers' Counsel, Ohio v. FERC,* 783 F.2d 206 (D.C.Cir.1986) (upholding as reasonable one FERC interpretation of the NGPA but reversing a second FERC interpretation because it conflicted with the plain meaning of the statute); *Nevada Power Co. v. Watt,* 711 F.2d 913, 920 (10th Cir.1983). We will defer when an agency has chosen between alternative possible constructions of an ambiguous statute:

"If ... the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpreta-

tion. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."

*Chevron U.S.A.,* 467 U.S. at 843, 104 S.Ct. at 2782 (footnotes omitted). Where the plain words of the statute do not answer a particular question, the agency interpretation must be reasonable, but it need not be the only reasonable interpretation or the interpretation that the reviewing court would adopt. *See, e.g., Chemical Mfrs. Ass'n v. Natural Resources Defense Council, Inc.,* 470 U.S. 116, 125, 105 S.Ct. 1102, 1107, 84 L.Ed.2d 90 (1985). A reviewing court will defer to an agency interpretation of an ambiguous statute unless the agency interpretation is contrary to the policies Congress sought to implement in enacting the statute. *See, e.g., Chevron U.S.A.,* 467 U.S. at 843 n. 9, 104 S.Ct. at 2782 n. 9; *Mid-Louisiana Gas Co.,* 463 U.S. at 342, 103 S.Ct. at 3037 (rejecting a FERC interpretation of the NGPA because it was contrary to the history, structure, and basic philosophy of the NGPA and would frustrate the policy Congress sought to implement).

### IV.

FERC has interpreted the NGPA to provide that if a sale of natural gas has been determined to qualify for both a deregulated category and a regulated category, the deregulated category will always determine the applicable price.[4] The producers challenge FERC's interpretation in this court. We reverse and remand because FERC's interpretation is contrary to the clear intent of Congress as expressed in the unambiguous language of the NGPA.

### A.

■ The first section of the NGPA that we must consider is § 121, which provides

---

4. FERC promulgated the following regulation in support of its interpretation:

    **§ 270.208  Applicability of section 121.**

    First sales of natural gas that is deregulated natural gas as defined in [18 C.F.R.] § 272.-103(a) is price deregulated and not subject to

the maximum lawful prices of the NGPA, regardless of whether the gas also meets the criteria for some other category of gas subject to a maximum lawful price under Subtitle A of Title I of the NGPA.

18 C.F.R. § 270.208 (1986).

that "the provisions of part A of this subchapter respecting the maximum lawful price for the first sale of each of the following categories of natural gas shall ... cease to apply" on specified dates. 15 U.S.C. § 3331(a). FERC interprets the language "shall ... cease to apply" to mean that if gas has been determined to be in one of the listed categories, there is no longer a ceiling price for such gas even if the gas has also been determined to be in a category that is not listed.[5] For example, if a producer has received a determination that gas is both new gas within the meaning of § 102 and stripper well gas within the meaning of § 108, once the ceiling price for § 102 was abolished in 1985, there is no longer a ceiling price for such gas despite the fact that the ceiling price for § 108 was not eliminated by the express language of § 121.[6]

The producers, on the other hand, argue that § 121 was not intended to determine whether dual category gas is to receive a regulated price or a deregulated price. They interpret § 121 to deregulate only those categories of gas that are listed. The producers rely on the report of the Conference Committee, which states: "The conference agreement does not provide for deregulation of any natural gas production not specifically enumerated in [§ 121]." Conf.Rep. at 92, U.S.Code Cong. & Admin. News 1978, 9009. Additionally, the Supreme Court has said that "Sections 121 and 122 of the NGPA provide a mechanism for the ultimate decontrol of *a number of categories* of natural gas." *Mid-Louisi-*

*ana,* 463 U.S. at 336 n. 14, 103 S.Ct. at 3034 n. 14 (emphasis added). According to the producers, then, the language "shall ... cease to apply" in § 121(a) provides for the elimination of the ceiling price only for those categories that are listed. The producers disagree with FERC's conclusion that § 121 requires dual category gas to receive a deregulated price.

We conclude that § 121 is ambiguous. Therefore, in the absence of another provision in the statute, FERC's determination that dual category gas is to be considered deregulated would be a reasonable interpretation of the ambiguous language of § 121. But Congress anticipated precisely this question in § 101(b)(5).

### B.

▮ The NGPA established several "Rules of general application" for interpretation of the Act.[7] 15 U.S.C. § 3311(b). *See also* Conf.Rep. at 74, U.S.Code Cong. & Admin.News 1978, 8990 ("The conference agreement includes several rules of general application to be used in interpreting this Act."). One of these rules concerns "Sales qualifying under more than one provision" of the Act:

> If any natural gas qualifies under more than one provision of this subchapter providing for any maximum lawful price or for any exemption from such a price with respect to any first sale of such natural gas, the provision which could result in the highest price shall be applicable.

---

**5.** FERC explained it understanding of § 121 as follows:

The statute clearly states that price controls for certain section 102(c), qualifying section 103(c) and section 105 gas "shall ... cease to apply January 1, 1985." NGPA section 121 mandates deregulation for these categories of gas. The fact that some of this gas also qualifies for another gas category does not alter this Congressional mandate to deregulate. 49 Fed.Reg. at 50,638.

**6.** Two types of gas that can be dually qualified within a regulated category and a deregulated category received particular attention from the commenters to the FERC order. First, tight formation gas under § 107(c)(5) can also be new gas under § 102 or § 103. Second, strip-

per well gas under § 108 can also be new gas under § 102 or § 103. *See* 49 Fed.Reg. at 46,-877–78; 49 Fed.Reg. at 50,637 n. 7.

**7.** The FERC order relied on the general principle of statutory construction that "if there exists a conflict in the provisions of the same act, the last provision in point of arrangement must control." *Lodge 1858, Am. Fed'n of Gov't Employees v. Webb,* 580 F.2d 496, 510 (D.C.Cir.) (citing eighty-three cases), *cert. denied,* 439 U.S. 927, 99 S.Ct. 311, 58 L.Ed.2d 319 (1978). We do not perceive a conflict between § 121 and § 101(b)(5). Furthermore, a general principle of statutory construction cannot prevail over the "Rules of general application" specified in the NGPA itself.

NGPA § 101(b)(5), 15 U.S.C. § 3311(b)(5). The plain language of this section addresses the very question that we are considering now: if gas has been determined to be dually qualified in a regulated category and a deregulated category, the category that could result in the highest price for the gas will apply.[8] FERC, however, has said that § 101(b)(5) is "helpful, but not dispositive" of this question.[9] 49 Fed.Reg. at 46,879. FERC has concluded that § 101(b)(5) does not apply to gas that has been determined to be in a deregulated category. This conclusion, however, is based on a strained construction of the unambiguous language of § 101(b)(5) and a misunderstanding of the purposes Congress sought to achieve in enacting the NGPA.

1.

■ Section 101(b)(5) applies to those categories of gas "providing for any maximum lawful price or for any *exemption* from such a price." Several commenters on the regulation proposed by FERC argued that categories for which no price ceiling now exists—*i.e.*, deregulated gas—are not categories "providing ... for any exemption from such a price." 15 U.S.C. § 3311(b)(5). FERC did not explicitly rely

on this interpretation of "exemption," but it did recognize that "there may be some merit to these arguments." 49 Fed.Reg. at 50,638.

FERC has suggested that the reference to "any exemption from such a price" refers not to deregulated gas, but rather to the authority of FERC to provide for special ceiling prices in particular situations. 49 Fed.Reg. at 36,401.[10] We have no doubt that the reference to "exemption" in § 101(b)(5) can refer to those instances in which FERC can exercise its statutory authority to set a different ceiling price when special circumstances are present. It does not follow, however, that "exemption" does not refer to deregulated categories of gas as well. The plain meaning of "exemption from such a price" includes those categories for which a price ceiling no longer exists. This interpretation of "exemption" is also consistent with the meaning of "exemption" in § 101(b)(9) of the NGPA. Section 101(b)(9) provides:

In the case of ... any price which is established under any contract for the first sale of natural gas which is *exempted* under part B of this subchapter from the application of a maximum lawful

---

**8.** We are the first court to consider the operation of § 101(b)(5) of the NGPA. Several decisions, however, have mentioned § 101(b)(5) in dicta. *Mid-Louisiana*, 463 U.S. at 335, 103 S.Ct. at 3034 ("§ 101(b)(5) of the Act specifies that if a volume of gas fits into more than one category, 'the provision which could result in the highest price shall be applicable'") (citation omitted); *Amoco Prod. Co. v. Western Slope Gas Co.,* 754 F.2d 303, 305 (10th Cir.1985) ("The NGPA further provides that, where gas falls within the scope of multiple categories prescribing different ceiling prices, the highest ceiling price is applicable."); *Columbia Gas Dev. Corp. v. FERC,* 651 F.2d 1146, 1156–57 (5th Cir.1981) ("If the [§ 104] gas qualifies for incentive pricing under section 102(d), 107(c)(5), or 108, under the rule of section 101(b)(5) the highest ceiling price becomes the applicable ceiling price."); *Oklahoma v. FERC,* 494 F.Supp. 636, 645 (W.D.Okla. 1980), ("Gas qualifying in more than one category is entitled to the highest price...."), *aff'd,* 661 F.2d 832 (10th Cir.1981), *cert. denied,* 457 U.S. 1105, 102 S.Ct. 2902, 73 L.Ed.2d 1313 (1982).

**9.** FERC has considered two arguments that § 121 prevails against § 101(b)(5). It is first suggested that because § 121 includes particular

exceptions to its provisions, *see* 15 U.S.C. § 3331(d)–(e), an exception for dually qualified gas should not be inferred. This argument, of course, assumes its conclusion: that § 121 deregulates gas that has been dually qualified. We have already concluded that § 121 does not address this situation. Second, several commenters asserted that § 101(b)(5) is a "provision of subtitle A" that "shall ... cease to apply" on January 1, 1985, according to § 121. This argument proves too much. Section 101(b)(5) is one of the "Rules of general application" for the NGPA. 15 U.S.C. § 3311(b). Some of the other "Rules of general application" define certain terms used in the Act and make it clear that the Act does not nullify or supersede contract prices set below the applicable ceiling price. 15 U.S.C. § 3311(b)(1), (2), (9). We cannot seriously consider the suggestion that these definitions and rules no longer apply after January 1, 1985.

**10.** FERC has the authority to raise the ceiling price for several categories of gas to a price that is "just and reasonable." 15 U.S.C. § 3314(b)(2); 15 U.S.C. § 3316(c); 15 U.S.C. § 3319(b)(2).

price under this subchapter, such maximum lawful price, or such *exemption* from such a maximum lawful price, shall not supersede or nullify the effectiveness of the price established under such contract.

15 U.S.C. § 3311(b)(9) (emphasis added). FERC has interpreted this section to set forth "the effect of the contract, regardless of the statutorily imposed maximum lawful ceiling prices or *exemptions from ceiling prices, i.e., deregulated prices.*" 49 Fed. Reg. at 46,879 (emphasis added). Similarly, the Fifth Circuit has referred to "exemption" in § 101(b)(9) to mean deregulated prices. *Pennzoil Co. v. FERC,* 645 F.2d 360, 374 (5th Cir.1981), *cert. denied,* 454 U.S. 1142, 102 S.Ct. 1000, 71 L.Ed.2d 293 (1982). Recognizing that a word found in two sections of a statute is intended to have the same meaning in each section, *Sorenson v. Secretary of the Treasury,* —— U.S. ——, 106 S.Ct. 1600, 1606, 89 L.Ed.2d 855 (1986) (citations omitted), we hold that the reference to "any exemption from such a price" in § 101(b)(5) includes categories of gas for which there is no longer a ceiling price. Accordingly, § 101(b)(5) anticipates the question of which category shall apply when gas has been determined to qualify both for a regulated category and a deregulated category.

### 2.

■ FERC construes § 101(b)(5) to provide the same answer to this question in every case: the deregulated category will always apply. The key to FERC's argument is the meaning of the word "could" in § 101(b)(5). Section 101(b)(5) provides that "the provision which *could* result in the highest price shall be applicable." FERC's interpretation of § 101(b)(5) relies on the obvious truth that the price of deregulated natural gas in an open market "could" theoretically reach infinity. No one contests this observation. FERC then argues that because the price of deregulated gas could theoretically rise indefinitely, it therefore

"could" always be greater than the price of regulated gas. This is also true. But FERC has failed to construe "could" as broadly in considering regulated categories of gas as it has in considering deregulated categories of gas. FERC has the authority to raise the ceiling price for regulated gas in several categories to a price that is "just and reasonable." *See* 15 U.S.C. § 3314(b)(2); 15 U.S.C. § 3316(c); 15 U.S.C. § 3319(b)(2). Additionally, the ceiling prices for all categories of gas rise steadily under the statute. *See, e.g.,* 15 U.S.C. § 3312(b)(2) (describing the formula for the increase of the ceiling price of new gas). The price of regulated gas is therefore certain to rise, and is capable of reaching an indefinite "just and reasonable" rate. Thus, the price of deregulated gas in an abstract situation "could" be higher than the price of regulated gas, but the price of regulated gas "could" be higher than the price of deregulated gas. Such an understanding of "could"—one that considers only the theoretical possibilities—renders § 101(b)(5) meaningless. If either price "could" be higher than the other price, the explicit command of § 101(b)(5) that "the provision which could result in the highest price shall be applicable" serves no purpose. We will not interpret a statute in such a way that a particular provision has no meaning. *Nevada Power Co.,* 711 F.2d at 920 (citations omitted).

"Could" makes sense in § 101(b)(5) only in the context of how gas sales actually occur. The NGPA focuses on sales at a particular point in time. *See, e.g.,* 15 U.S.C. § 3315(a) (the ceiling price "shall apply to any first sale of natural gas delivered during any month"). Section 101(b)(5) therefore requires a comparison of the applicable price for each category at a particular moment. In most instances the contract between the producer and the pipeline specifies the price which is to apply to categories that have been regulated and categories that have been deregulated.[11]

---

11. Natural gas producers and pipelines have anticipated the deregulation of natural gas. Accordingly, "[m]any contracts contain two clauses—one which sets the price if gas is regulated

and one which is implemented if gas is deregulated." 49 Fed.Reg. at 46,878. Section 101(b)(5) provides that if gas is dually qualified in a regulated category and a deregulated cate-

The contractual provision that "could" result in the highest price at a particular moment will establish the applicable category under § 101(b)(5).

### 3.

Much of the concern voiced by the intervenor pipelines and FERC suggests that § 101(b)(5) was not intended to allow producers an ongoing choice as to whether gas sales are to be regulated or deregulated. In a sense, this is correct, for § 101(b)(5) does not speak in terms of a choice or an election. Instead, § 101(b)(5) provides that whichever category could produce a higher price *shall* apply. But producers are clearly presented with a choice as to which category or categories for which they seek to qualify particular gas. This is the election that the statute allows and which FERC would deny.

■ FERC has concluded that "a determination that gas qualifies as new tight-formation gas is implicitly a determination that the gas meets the qualifications for either section 102(c) or 103." 49 Fed.Reg. at 46,880; *see also* 49 Fed.Reg. at 50,639. FERC recognizes that such a dual qualification was unlikely to have been explicit at the time the determination was made. Nevertheless, a producer who decided to qualify gas *only* as tight formation gas under § 107(c)(5), a category that is not listed for deregulation in § 121, would be held by FERC to have also obtained a determination that the gas is new gas under § 102 or § 103—categories which have now been deregulated. There is no support for such automatic determinations in the NGPA. Although the showing required for a qualification under § 107(c)(5) would usually support a qualification under § 102 or § 103,[12] Congress did not provide that one qualification would automatically result in a second qualification. Instead, Congress intended that a producer select the category or categories for which he or she desires to qualify particular gas. In describing the

gory, the contractual price for regulated gas in the regulated category is to be compared with the contractual price for deregulated gas in the deregulated category. The higher of these two prices will determine the applicable category for a particular month.

Many gas contracts establish a specific price for deregulated gas or provide that the deregulated price is determined by the price of other gas sales. *See generally Materials on Oil & Gas Contracts* 10–11, 481–82 (J. Lowe ed. 1985). In each of these instances the contract provides a specific price for deregulated gas that can be compared with the price for regulated gas.

However, "many gas sales contracts contain a clause which requires the parties to renegotiate the sales contract if deregulation occurs." 49 Fed.Reg. at 46,879. Such a provision results in a "Catch–22" situation because of § 101(b)(5): the deregulated category will apply only if the renegotiated price is greater than the regulated price, but the contractual provision calling for renegotiation does not take effect until the gas has been deregulated. Furthermore, the price of gas will probably never vary from the regulated price if the deregulated price is to be set by renegotiation. Gas will be sold at the regulated price unless the producer and the pipeline agree to a different price. A producer is unlikely to renegotiate for a price below the regulated price; a pipeline is unlikely to renegotiate for a price above the regulated price. The regulated price, then, will always prevail.

The effect of a renegotiation clause might suggest that FERC is correct: § 101(b)(5) was not meant to apply to categories of gas that have been deregulated. As we have shown, however, the plain language of § 101(b)(5) refers to categories of gas that are exempt from ceiling prices—deregulated categories. And as we will show, FERC's interpretation of § 101(b)(5) would deny the statutory right of a producer to qualify gas in the category or categories of his or her choice. For these reasons, we hold that § 101(b)(5) was intended to apply to categories of gas that have been deregulated. We recognize that the effect of a renegotiation clause is to create an anomaly in the operation of the NGPA in certain circumstances, but we defer to Congress for the appropriate resolution of this difficulty. *See Board of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp.,* —— U.S. ——, 106 S.Ct. 681, 689, 88 L.Ed.2d 691 (1986).

12. The information required to receive a determination that gas qualifies as new tight formation gas includes the information required to qualify gas as new gas under § 102 or a new onshore production well under § 103. 18 C.F.R. § 274.205(e)(1)(i) (1986). Recompletion tight formation gas, however, cannot necessarily be qualified under any other category. 49 Fed.Reg. at 46,880 n. 18.

The specification ot what types of gas are "produced under such other conditions as [FERC] determines to present extraordinary risks of costs" and thus qualify under § 107(c)(5) is obviously left to the discretion of FERC. Our decision in this case does not interfere with FERC's continuing authority to modify the criteria that establish which types of gas qualify under § 107(c)(5).

operation of § 101(b)(5), Representative Dingell stated:

> Of course this does not impose upon either the FERC or any state agency an affirmative obligation to identify which of several potential classifications should apply. It is up to the producer to apply for whatever designation he determines is most likely to be of greatest benefit to him (in most cases that will be the designation which also yields the highest price).

124 Cong.Rec. 38,363–64 (1978). Similarly, Senator Jackson said that § 101(b)(5) "stands for the proposition that a producer may claim or apply for the highest price to which he is entitled. It does not imply an administrative duty to compel a State or Federal agency to search through the various price classifications under the act and find the permissible price." 124 Cong.Rec. 29,109 (1978).

FERC's order thus rests on the erroneous assumption that gas can be determined to qualify for a particular category without going through the specific determination procedure set forth in § 503. For this reason, FERC's interpretation cannot be upheld.[13]

#### C.

Although we have concluded that the clear language of the NGPA requires us to reject FERC's treatment of dual category gas, we recognize that FERC suggests that the goals of the NGPA support its position. FERC has defended its interpretation as "consistent with the overall scheme envisioned by Congress when it enacted the NGPA—to provide incentive prices to encourage exploration and development of new reserves in the short-term, and to gradually substitute market forces for regulated prices by phasing in deregulation in 1985 and 1987." 49 Fed.Reg. at 36,401; 49 Fed.Reg. at 46,878. FERC has properly recognized the statutory "goal of increasing energy supplies." 49 Fed.Reg. at 50,638. But FERC has concluded, "It is our belief that the statutory intent to deregulate takes precedence over the statute's increased supply objective." 49 Fed.Reg. at 46,878.

FERC has confused the ultimate purpose of the statute—"to assure adequate supplies of natural gas at fair prices," *Transcontinental Gas Pipe Line Corp.*, 106 S.Ct. at 716—with one of several means chosen to accomplish that purpose—phased deregulation. FERC is correct that "phased deregulation was one of the primary methods utilized by Congress to increase energy supplies." 49 Fed.Reg. at 50,638 (footnote omitted). But the NGPA was the "careful reconciliation of two strong, but divergent, responses to the natural gas shortage." *Mid-Louisiana*, 463 U.S. at 331, 103 S.Ct. at 3031.[14] Incentive

---

**13.** In addition to implicitly determining that gas qualifies for a category for which a producer has not applied, FERC would limit the period during which a producer could obtain a determination. According to FERC, a producer must apply for a determination that gas qualifies for a particular category before deregulation goes into effect. Brief of Respondent at 30. Section 101(b)(5) then operates to allow a producer to qualify gas in two categories and obtain the highest ceiling price until one of the categories has been deregulated. Upon deregulation, however, the decision of the producer to obtain a determination that the gas qualifies for a category that has now been deregulated means that the gas is now deregulated and no ceiling price applies.

We do not know why FERC believes there is a particular date after which a producer cannot obtain a determination that gas qualifies for a particular category. Nothing in the statute requires such a result. Indeed, FERC still requires producers who wish to sell gas that could be qualified only under a category that has been

deregulated to obtain a determination that the gas qualifies for that category. 49 Fed.Reg. at 46,875–76. It is thus difficult for FERC to maintain that a producer must qualify gas in a particular category before the date deregulation takes effect.

**14.** Congress may be unanimous in its intent to stamp out some vague social or economic evil; however, because its Members may differ sharply on the means for effectuating that intent, the final language of the legislation may reflect hard fought compromises. Invocation of the "plain purpose" of legislation at the expense of the terms of the statute itself takes no account of the processes of compromise and, in the end, prevents the effectuation of congressional intent.

*Board of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 106 S.Ct. 681, 689, 88 L.Ed.2d 691 (1986).

**15.** "The new statutory rates are intended to provide investors with adequate incentives to devel-

prices for difficult to produce gas are another means by which Congress sought to increase energy supplies.[15] We do not agree with FERC that the incentive prices are necessarily short-term.[16] These prices are never removed by the express language of § 121, so gas that qualifies only for an incentive price category will unquestionably remain regulated. Deregulation is both phased *and* partial. *See* A. Tussing & C. Barlow, *The Natural Gas Industry* 116 (1984) (noting that old gas is never deregulated under the NGPA). By misinterpreting the NGPA to be exclusively a deregulation statute, FERC has overlooked incentive prices and other provisions that sought to address the natural gas shortage in a different way. We will not strain the plain meaning of § 101(b)(5) in order to serve a goal of deregulation that is itself only one of several means adopted to achieve the purposes of the NGPA.

Congress enacted the NGPA expecting that natural gas prices would rise steadily in future years. *See, e.g.,* 124 Cong.Rec. 38,361 (1978) (statement of Rep. Dingell);

124 Cong.Rec. 31,819 (statement of Sen. Metzenbaum). That prices have actually dropped precipitously accounts for the anomalous situation we now see: producers seek the regulated ceiling price rather than the deregulated market price.[17] Because § 101(b)(5) provides that the category which could result in the highest price applies, gas that has been qualified in both a regulated category and a deregulated category will now be sold at the regulated price until the market price rises above the ceiling price. Therefore, § 101(b)(5) can have the unanticipated effect of operating as a price floor for producers. Congress did not expect this result, for Congress did not expect that natural gas prices would fall. Changes in economic conditions, however, do not provide the courts with a license to change the express terms of a statute. *See BankAmerica Corp. v. United States,* 462 U.S. 122, 133, 103 S.Ct. 2266, 2272, 76 L.Ed.2d 456 (1983).

We observe that the Supreme Court was confronted with a similar problem last

op new sources of supply." *Mid-Louisiana,* 463 U.S. at 334, 103 S.Ct. at 3033. In particular, "Section 108 is a special incentive rate for stripper wells, that is, marginal production.... The § 108 rate ... is the highest regulated rate provided for by the NGPA." *Pennzoil Co.,* 645 F.2d at 380 n. 39.

The Congressional debate over the NGPA provides somewhat contradictory indications as to whether stripper well gas was to be considered deregulated after new gas was deregulated. Representative Dingell's statement that dual qualification "would permit the producer to obtain stripper well pricing under section 108 prior to January 1, 1985, and deregulation as new gas thereafter" could support either interpretation of § 101(b)(5) in light of his assumption that the deregulated price of natural gas would be higher than the regulated price by 1985. 124 Cong.Rec. 38,364 (1978). FERC places greater weight on the statement of Senator Bartlett: [I]n informal discussions on the floor it has been asserted that stripper wells are deregulated. This is true only to the extent that such wells are otherwise new wells and would be deregulated anyway. Their character as stripper wells, as shown under section 121, does not get them deregulated in any way. And since the vast majority of all stripper wells are wells now in existence, there would be very little deregulation caused by that section. 124 Cong.Rec. 31,387 (1978). At another point in the debate, however, Senator Bartlett said, "This bill will keep under Federal controls *forever* the following categories of natural gas: all

flowing interstate gas; all offshore gas produced from present leases, including the new discoveries; all intrastate gas under contract at a price below $1 per thousand cubic feet; and *stripper well natural gas.*" 124 Cong.Rec. 29,379 (1978) (emphasis added). Furthermore, the Conference Report suggested that "natural gas qualifying as gas produced from a natural gas stripper well [could be] sold subject to the provisions of sec. 108, rather than taking deregulated treatment as an existing intrastate contract." Conf. Rep. at 83. We give greatest weight to the position expressed in the Conference Report.

16. In *Transcontinental Pipe Line Gas Corp.,* 106 S.Ct. at 716–17, the Court referred to "Congress' determination that the supply, the demand, and the price of high-cost gas be determined by market forces." The type of high-cost gas at issue in that case was § 107(c)(1) gas "produced from any well [with] a completion location which is located at a depth of more than 15,000 feet." 15 U.S.C. § 3317(c)(1). The ceiling price for § 107(c)(1) gas was eliminated by the express provision of § 121(b), thereby demonstrating Congress' intent that market forces should determine the price for such gas. In contrast, the incentive prices for, *inter alia,* § 107(c)(5) and § 108 gas are never eliminated by § 121.

17. Natural gas producers advanced the interpretation adopted by FERC in this case when market conditions would have produced a higher price for deregulated gas. *See* Interim Rule Covering High-Cost Natural Gas Produced from Tight Formations, 45 Fed.Reg. 13,422 (1980).

term. In *Board of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp.,* — U.S. ——, 106 S.Ct. 681, 88 L.Ed.2d 691 (1986), the Court considered a definition of "bank" selected by the Federal Reserve Board because it was thought to be consistent with the broad purposes of the Bank Company Holding Act, 12 U.S.C. §§ 1841–1850. The Court referred to a similar situation that it had considered previously:

The process of effectuating Congressional intent at times may yield anomalies. In *TVA v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) [holding that the express language of the Endangered Species Act did not admit of an exception when an almost completed multi-million dollar dam project threatened to render the three-inch snail darter extinct], for example, we were confronted with the explicit language of a statute that in application produced a curious result. Noting that nothing prohibited Congress from passing unwise legislation, we upheld the enforcement of the statute as Congress had written it. Congress swiftly granted relief to the petitioner in *Hill;* but did so in a fashion that could not have been tailored by the courts. See Pub.L. 95–632, § 5, 92 Stat. 3760.

*Id.* 106 S.Ct. at 689 n. 7. The Court in *Dimension* held that the definition proposed by the Federal Reserve Board conflicted with the plain language of the Act, concluding that "[t]he statute may be imperfect, but the Board has no power to correct flaws that it perceives in the statute it is empowered to administer." *Id.* at 689.

Congress is capable of modifying the operation of § 101(b)(5) if it desires to do so. This court, however, will not undertake that task. Our role is simply to give effect to the words Congress has chosen. We therefore hold that FERC acted contrary to the intent of Congress as evidenced in the unambiguous language of § 101(b)(5). We reverse and remand for further proceedings consistent with this opinion.

## V.

■ The second FERC order that we review concerns the deregulation of intrastate gas. A trio of statutory provisions— §§ 121(a)(3), 121(e), and 105(b)(3)(A)—determine the status of intrastate gas that is sold pursuant to a contract that existed at the time of the enactment of the NGPA. 15 U.S.C. § 3331(a)(3); 15 U.S.C. § 3331(e); 15 U.S.C. § 3315(b)(3)(A). FERC adopted a different construction of these provisions on rehearing than it had in its original order. *Compare* 49 Fed.Reg. at 46,880 (final rule) *with* 49 Fed.Reg. at 50,640–41 (order on reh'g). Only Shell appeals from the order on rehearing. We affirm.

Section 121(a)(3) provides for the deregulation of:

Natural gas sold under an existing contract, any successor to an existing contract, or any rollover contract if—

(A) such natural gas was not committed or dedicated to interstate commerce on November 8, 1978; and

(B) the price paid for the last deliveries of such natural gas occurring on December 31, 1984, or, if no deliveries occurred on such date, the price would have been paid had deliveries occurred on such date is higher than $1.00 per million Btu's.

15 U.S.C. § 3331(a)(3). In essence, § 121(a)(3) deregulates intrastate gas that is sold under a contract that set a price in excess of $1.00 on December 31, 1984.

Once such gas has been deregulated, it can become subject to a "special rule" limiting the price that can be obtained pursuant to an indefinite price escalator clause.[18] Conf.Rep. at 83. Congress was concerned

---

18. An "indefinite price escalator clause" is a contractual provision:
   (i) which provides for the establishment or adjustment of the price for natural gas delivered under such contract by reference to other prices for natural gas, for crude oil, or for refined petroleum products; or

(ii) which allows for the establishment or adjustment of the price of natural gas delivered under such contract by negotiation between the parties.

15 U.S.C. § 3315(b)(3)(B).

that "following deregulation, the operation of indefinite price escalator clauses ... could operate to increase rapidly intrastate gas prices following deregulation." 124 Cong.Rec. 38,365 (1978) (statement of Rep. Dingell). Therefore, sections 121(e) and 105(b)(3)(A) were included to avoid rapid price increases by restricting the operation of indefinite price escalator clauses. Section 121(e) provides that § 105(b)(3)(A) applies to natural gas that has been deregulated by § 121(a)(3) and "which is sold under any existing contract or successor to an existing contract at a price established under an indefinite price escalator clause." 15 U.S.C. § 3331(e). Section 105(b)(3)(A), in turn, provides:

> Effective January 1985, and each month thereafter, in the case of any first sale of natural gas, which is sold at a price established under any indefinite price escalator clause of any existing contract or successor to an existing contract and for which the contract price on December 31, 1984, is higher than $1.00 per million Btu's, the maximum lawful price ... shall be [established pursuant to a formula set forth in this section].

15 U.S.C. § 3315(b)(3)(A). FERC and Shell agree that the special rule embodied in § 105(b)(3)(A) operates to limit only those price increases caused by an indefinite price escalator clause. The parties disagree about the category of gas to which the special rule applies.

FERC has concluded that "the section 121(e) and section 105(b)(3)(A) limitation applies to any indefinite price escalator clause in an existing or successor intrastate contract that is, or would have been in excess of $1.00 per MMBtu on December 31, 1984." 49 Fed.Reg. at 50,641. Shell argues that the limitation applies to intrastate contracts only "if they were above $1.00 on December 31, 1984 *solely by reason of indefinite price escalator clauses.*" Supplemental Initial Brief of Shell Offshore Inc. and Shell Western E & P Inc. at 12 (emphasis original). The crucial difference is this: the FERC interpretation does not focus on how the price was established on December 31, 1984, while Shell would limit the application of the special rule to those

circumstances in which the indefinite price escalator clause established the price on December 31, 1984.

We hold that FERC has adopted a reasonable interpretation of the provisions of the NGPA that deregulate intrastate natural gas sales. The plain language of § 105(b)(3)(A) does not demand the interpretation advanced by Shell. Sections 105(b)(3)(A) and 121(e) impose a special rule limiting the price that can now be established by an indefinite price escalator clause. Those sections, however, do not contain the additional requirement that the December 31, 1984 price be established by an indefinite price escalator clause. The Conference Report makes it clear that *how* the December 31, 1984 price exceeded $1.00 is not relevant:

> This special rule limits the operation of indefinite price escalator clauses in existing intrastate contracts for which the contract price on December 31, 1984 is higher than $1.00 per MMBtu's.... This limitation applies to natural gas which is deregulated solely as a result of qualifying as an existing contract or a successor to an existing contract in excess of $1.00 per million Btu's on or before December 31, 1984.

Conf.Rep. at 83, U.S.Code Cong. & Admin. News 1978, 8999. Nor does the agreement reached by the conferees suggest that how the price was established on December 31, 1984 is important:

> [I]f the price of natural gas under the contract was greater than $1.00/MM Btu's on December 31, 1984, the price thereafter charged for natural gas ... subject to such contract may not exceed [the ceiling price imposed by the special rule] due to the operation of any indefinite price escalator clause in such contract.

Staff of House Comm. on Interstate and Foreign Commerce & Staff of Senate Comm. on Energy and Natural Resources, 95th Cong., 2d Sess., *Natural Gas Pricing Agreement Adopted by the Conferees on H.R. 5289* 18–19 (Comm.Print.1978).

Shell has suggested that the reference to $1.00 per million Btu's in § 105(b)(3)(A) is superfluous under FERC's construction of the statute. Section 121(a)(3) deregulates only that natural gas which exceeds the $1.00 threshhold. The additional reference to the threshhold in § 105(b)(3)(A) is necessary to limit the application of the special rule to gas that was priced above $1.00 on December 31, 1984. Without such a reference in § 105(b)(3)(A), the special rule would also apply to natural gas that was sold at a price below $1.00 on December 31, 1984 and therefore has not been deregulated by § 121(a)(3). The $1.00 threshhold thus operates to distinguish' between two schemes of regulation. Gas priced below $1.00 on December 31, 1984 remains subject to the ceiling price imposed by § 105(b). Gas priced above $1.00 on December 31, 1984 is subject to a slightly different ceiling on the price established by an indefinite price escalator clause. Accordingly, FERC's interpretation has properly given effect to all parts of the statute.

### VI.

FERC's conclusion that natural gas that has been qualified both in a regulated category and a deregulated category is always to be considered deregulated is contrary to the express language of § 101(b)(5) of the NGPA. Accordingly, we reverse and remand that part of the order. FERC's interpretation of the provisions governing the deregulation of intrastate gas is reasonable. We therefore affirm that part of the order.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.