**W.A. MONCRIEF, Jr., individually, as independent executor of the Estate of W.A. Moncrief, deceased, as Trustee for the Lee Wiley Moncrief Trust, as Trustee for the Tom O. Moncrief 1967 Trust, as Trustee for the William Alvin Moncrief, III, Trust; Charles B. Moncrief, individually and as independent executor and personal representative of the Estate of W.A. Moncrief, deceased; Richard W. Moncrief, as independent executor and personal representative of the Estate of W.A. Moncrief, deceased, and as Trustee for the RWM 1988 Trust;**

---

Michael J. Moncrief, individually and as Trustee for the Michael T. Moncrief Grantor's Trust; Richard Barto Moncrief, individually, and Wade W. Wiley, Jr., as Trustee for the Richard Barto Moncrief 1988 Trust, Plaintiffs,

v.

WILLISTON BASIN INTERSTATE PIPELINE COMPANY, and MDU Resources Group, Inc., Defendants.

No. 93–CV–1045–B.

United States District Court, D. Wyoming.

March 10, 1995.

Craig Newman, Casper, WY, and William Pannill, Roy L. Barnes, Houston, TX, for plaintiffs W.A. Moncrief, Jr., individually, as independent executor of the estate of W.A. Moncrief, deceased, as Trustee for the Lee Wiley Moncrief Trust, as Trustee for the Tom O. Moncrief 1967 Trust, and as Trustee for the William Alvin Moncrief, III, Trust, Charles B. Moncrief, individually and as independent executor and personal representative of the Estate of W.A. Moncrief, deceased, and Richard W. Moncrief, as independent executor and personal representative of the Estate of W.A. Moncrief, deceased, and as Trustee for the RWM 1988 Trust.

Terry W. Mackey, Cheyenne, WY, for plaintiffs Michael J. Moncrief, individually and as Trustee for the Michael J. Moncrief Grantor's Trust, Richard Barto Moncrief, individually, and Wade Wiley, Jr., as Trustee for the Richard Barto Moncrief 1988 Trust.

John Suder, appeared as guardian ad litem, for Lee Wiley Moncrief.

James S. Hill, Daniel S. Kuntz, Zuger, Kirmis & Smith, Bismarck, ND, and Frank D. Neville, Casper, WY, for defendants Williston Basin Interstate Pipeline Co. and MDU Resources Group, Inc.

### ORDER ON MOTIONS FOR SUMMARY JUDGMENT

BRIMMER, District Judge.

The above-entitled matter having come before the Court upon the parties' motions for summary judgment and briefs in support of and in opposition thereto, and the Court having reviewed the materials on file herein, having heard argument from the parties, and being fully advised in the premises, FINDS and ORDERS as follows:

## Background

This case arises out of a dispute regarding the terms of a contract between the plaintiff's father, W.A. Moncrief, and the defendants, Williston Basin Interstate Pipeline Company (WBIPC) and Montana Dakota Utilities Resources Group (MDU), in which the defendants agreed to purchase natural gas from the Powell II Unit, an operating unit in Converse County, Wyoming.

On July 7, 1976, MDU signed separate contracts with Woods Petroleum Company (Woods) and W.A. Moncrief, who had a working interest in the unit, and several other interest owners, to purchase gas produced from the Powell II Unit. Under the contract with Moncrief, MDU agreed to purchase from Moncrief "the daily quantity of gas which is physically available to Buyer at the delivery point on each day of the term hereof" for a term of 20 years, until July of 1996. MDU wanted all the gas that Moncrief and Woods produced, but the contract capped MDU's obligation to purchase from Powell II Unit at 12,000 Mcf (million cubic feet) per day, which was the capacity of the separation plant and pipeline from the unit. MDU did have the right to take volumes in excess of 12,000 Mcf daily by constructing facilities necessary to accept such volumes.

The contract set a base price of $1.00 per MMBTU (million British Thermal Units) from the date of initial delivery until January 1, 1978. The price provision set escalations of 1.5 cents per MMBTU every year beginning January 1, 1978. In addition, the price provision of the contract contained three indefinite escalator clauses: (1) an area-rate clause providing that the contract price would automatically increase to a "higher just and reasonable area rate including all adjustments for the same type of gas as committed hereunder" prescribed or permitted for the pricing area in which the proper-

ties are located by the Federal Power Commission or a successor; (2) a favored-nations clause covering lands located East of the Continental Divide in Wyoming;[1] and (3) a clause providing for a price redetermination in the event that deregulation of interstate gas should occur. This final clause prohibited any redetermination resulting in a price lower than the price otherwise applicable under the contract.

During the term of the contract, the parties amended it to include additional lands outside the Powell II Unit upon which Woods and W.A. Moncrief had production. In 1983, the owners of the Powell II Unit started a repressurization program for secondary recovery of oil and natural gas from the unit. The reinjection plan called for a 14 year period of recycling followed by six or seven years of "blow down" production of the injected gas. All of the natural gas produced from the unit was processed to remove liquid hydrocarbons and then injected or "recycled" back into the unit to maintain the reservoir pressure. In addition to this recycled native gas, the unit owners were encouraged by MDU to purchase natural gas rather than nitrogen (which was less costly) from outside sources ("makeup gas") because the nitrogen would have to be removed by processing upon production. All the natural gas from the unit was used for recycling and no gas was delivered to MDU during that time. Defendant MDU did, however, continue to purchase gas produced from Moncrief and others from lands located outside the pressure maintenance unit dedicated in the contract.

The enactment of the Natural Gas Policy Act (NGPA) on November 9, 1978, for the first time extended price regulations to the intrastate market. The Powell II Unit gas sold under the contract was classified as § 105 gas by the Federal Energy Regulatory Commission (FERC).[2] Section 105 gas is

---

1. A "favored nations" clause (a term derived from international law referring to trade agreements providing for the extension of terms to another party as favorable as those extended to the most favored nation with which it may deal, *Amoco Prod. Co. v. Stauffer,* 612 P.2d 463 (Wyo. 1980)) is an escalation clause which provides for a rise in the contract price to match a higher price given to another seller in the same area.

Williams and Meyers, *Oil and Gas Law,* (1994) Vol. 8, pp. 357–358.

2. For the purposes of setting a price ceiling, the NGPA separated intrastate gas into two different categories: § 102 gas for "new" gas brought into production after the passage of NGPA, and § 105 gas, also known as "old gas", which was already

"old gas" which was sold under an existing contract on November 8, 1978, but which was not committed or dedicated to interstate commerce. The Act established a maximum lawful price for § 105 gas which was the lower of the contract price or the maximum price for § 102 gas, new natural gas. Pursuant to the area rate clause of the Moncrief contract, MDU paid the § 102 price for gas delivered under the contract until January 1, 1985. The highest regulated price that MDU matched under the contract was the § 102 rate for December 1984 of $3.845. Additionally, MDU reimbursed Moncrief for severance taxes under Section 110 of the NGPA. Effective January 1, 1985, some categories of §§ 102 and 103 gas prices were deregulated. The parties, however, dispute whether the deregulation covered the price of § 105 gas.

Anticipating this deregulation, MDU sent a letter to its natural gas sellers, including W.A. Moncrief, proposing a price of $2.25 per MMBTU effective January 1, 1985. This proposed price was less than the previous regulated price. At about the same time, MDU formed a subsidiary, the Williston Basin Interstate Pipeline Company (WBIPC), and assigned its gas contracts to WBIPC, effective January 1, 1985. Williston Basin Interstate Pipeline Company offered to pay an additional fifty cents per MMBTU for gas produced in 1985, if the seller agreed to execute a contract amendment releasing MDU and WBIPC from any past claims under the contract, which Moncrief never did.

Representatives from MDU and WBIPC met with W.A. Moncrief and W.A. Moncrief, Jr. ("Tex" Moncrief) in August of 1984 and February 28, 1985, to discuss these proposals. There is some dispute as to the outcome of those discussions: Ronald Tipton, the new vice-president in charge of gas supply at MDU, recalls that the Moncriefs would not agree to amend their contract, but he concluded that they would not sue WBIPC even if it reduced the price to $2.25 per MMBtu for the gas. Tex Moncrief does not recall the

substance of these discussions, but notes taken by one of his employees indicate that Tex Moncrief never signed the amendment and that he did orally agree to the $2.25 per MMBTU price. Williston Basin Interstate Pipeline Company paid Woods the $2.25 per MMBTU price for what it understood was Moncrief's interest in the gas purchased under the contract during 1985 and 1986 and those payments were cashed by Moncrief.

W.A. Moncrief died on May 21, 1986, at the age of 92, and Tex Moncrief became one of the co-executors of his father's estate. He has since qualified as an independent executor in an ancillary probate proceeding commenced in Wyoming, since the working interests in the Powell II Unit are interests in rem and the Wyoming probate court therefore has exclusive jurisdiction thereof. *See In re Ray's Estate*, 287 P.2d 629, 634 (Wyo. 1955) (adopting doctrine of *lex loci rei sitae*, the law of the place where the subject matter is located governs) and Wyo.Stat. Section 2–2–101 (Wyoming probate courts issuing letters testamentary have exclusive jurisdiction over all matters touching on the settlement and distribution of estates).

On October 3, 1986, WBIPC notified Tex Moncrief of its intent to reduce the price it paid for natural gas effective January 1, 1987, and Williston Basin Interstate Pipeline Company subsequently paid Woods $1.75 per MMBTU for W.A. Moncrief's gas from January 1, 1987, through October 31, 1993. Those payments were made to Woods, as Moncrief's agent, accompanied by statements reflecting the purchase price for the gas. Woods then provided monthly settlement statements and checks to Moncrief[3] which reflected the amounts received for the gas. These payments were accepted without reservation or objection. Moncrief admits that he became aware of the price being paid by WBIPC for at least a part of this period and has never tendered repayment of any of the checks.

in production when the NGPA was enacted. 15 U.S.C. §§ 3312, 3315.

**3.** The interests of W.A. Moncrief, deceased, and W.A. Moncrief, Jr., as an independent co-executor of his estate, and of the grandchildren of W.A. Moncrief and Elizabeth Moncrief, his devisee,

will be referred to herein collectively as "Moncrief." The evidence shows that their oil and gas affairs were handled from the Moncrief Building, Ft. Worth, Texas, by an assembly of executives and clerks employed for that purpose.

In 1993, Moncrief and the Powell II Unit owners decided to discontinue production and begin blow-down of the unit.[4] On August 9, 1993, Tex Moncrief notified WBIPC that the gas produced during blow-down was dedicated and available for purchase under Moncrief's contract with WBIPC. In this letter, Moncrief also stated for the first time his position that the governing contract price is the December, 1984, § 102 price of $3.845 per MMBtu plus tax reimbursement.

Plaintiff Tex Moncrief filed suit in this Court on November 10, 1993, as the independent executor of W.A. Moncrief's estate. His co-executors and the grandchildren (and their trusts) of W.A. Moncrief, to whom the working interests have been conveyed have since been added to this suit and realigned as plaintiffs.

Plaintiff's theories of recovery have been evolving. Moncrief's three different complaints in this action have reflected three different theories of recovery. Moncrief's initial complaint argued that the sellers were owed a higher price based on the Section 7.6 "favored nation" clause of the contract. In this initial complaint, Moncrief also asserted that the natural gas sold under the contract was deregulated on January 1, 1985, and that, based on the terms of the contract, the applicable price was the last regulated price of $3.845 per MMBtu plus tax reimbursement.

In the plaintiff's First Amended Complaint he abandoned the application of the favored nations clause and concentrated on the last regulated price and his claim that the contract did not allow the contract price to decrease. In the First Amended Complaint, Tex Moncrief argued that deregulation of the contract price had occurred on January 1, 1985.

Finally, the plaintiff's Second Amended Complaint, currently before the Court, proposes that the gas under the contract remained regulated after all. Moncrief now argues that the governing price comes from the Natural Gas Policy Act § 105(b)(3) which sets a ceiling price for "old gas." According to this contention, the applicable price under the contract is set by 18 C.F.R. 271.101.

■ Plaintiff's Second Amended Complaint also responded to the defendants' and the Court's concerns about Tex Moncrief's status as the real party in interest by adding the numerous other members of the Moncrief family, and their various trusts. Since all of these added parties are, like Tex Moncrief, residents of Texas, diversity of citizenship did not exist; but at the pretrial conference hearing on October 28, 1994, the Court, *sua sponte*, realigned the new parties as cross-plaintiffs.[5] Cross–Plaintiffs have filed a complaint against Tex Moncrief, challenging his interest in his father's estate and, at the same time, joining and supporting his complaint against the defendants. Both parties have moved for summary judgment on the various issues they dispute.

### *Discussion*

### I. *Standard of Review*

■ "By its very terms, [the Rule 56(c)] standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there is no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original). An issue of material fact is "genuine" if a "reasonable jury could return

---

**4.** During blow-down, the operator ceases injecting gas and allows the pressure to decline as gas is withdrawn from the unit. The significance of the blow-down is that it results in very high amounts of daily gas, which of course at a high price could result in a large recovery by the plaintiffs.

**5.** Such realignment is authorized by *Indianapolis v. Chase Nat'l Bank*, 314 U.S. 63, 62 S.Ct. 15, 86 L.Ed. 47 (1941). In *Indianapolis*, the Supreme Court directed that federal courts should "look

beyond the pleadings and arrange the parties according to their sides in the dispute." *Indianapolis*, 314 U.S. at 69, 62 S.Ct. at 17, *quoting Dawson v. Columbia Trust, Co.*, 197 U.S. 178, 180, 25 S.Ct. 420, 421, 49 L.Ed. 713 (1905). Where more than one claim is presented, the court should look to the "primary and controlling matter in dispute." *Indianapolis*, 314 U.S. at 69–70, 62 S.Ct. at 17, *quoting, Merchants' Cotton–Press Co. v. Insurance Co.*, 151 U.S. 368, 385, 14 S.Ct. 367, 373, 38 L.Ed. 195 (1894).

a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. at 2510.

 The trial court decides which facts are material as a matter of law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.; see also, Moya v. United States,* 35 F.3d 501 (10th Cir.1994). Summary judgment may be entered "against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case, and oh which that party will bear the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Moya,* 35 F.3d at 503. The existence of "a scintilla of evidence in support of the plaintiff's position is insufficient to defeat a properly supported motion for summary judgment." *Moya,* 35 F.3d at 503. In considering a party's motion for summary judgment, the court must examine all evidence in the light most favorable to the nonmoving party. *Moya,* 35 F.3d at 502–503.

## II. Affirmative Defenses Asserted by the Defendants

Before the Court considers the merits of the plaintiffs' claims it must first address the affirmative defenses asserted by the defendants, for if the defendants have a valid affirmative defense, the merits need not be addressed by the Court.

Defendants assert the following affirmative defenses in their Answer to the plaintiff's Second Amended Complaint: (1) Moncrief's claims for a contract price based upon the last regulated price plus production taxes are barred by the statute of limitations; (2) *Force majeure* based on governmental action; (3) Waiver of claim by Monrief's acceptance of payment; (4) The payments constituted a novation; (5) Estoppel; (6) Defendant has paid more than the contract required; (7) Accord and satisfaction; (8) Tex Moncrief is not the real party in interest; and, (9) Moncrief's claims are barred by the doctrine of laches. The Court will discuss each of these affirmative defenses in turn.

### A. The Statute of Limitations.

 Defendants argue that Moncrief's claims are barred by the statute of limitations. Contracts for the sale of natural gas are governed by Article 2 of the Uniform Commercial Code ("U.C.C."). *Prenalta Corp. v. Colo. Interstate Gas Co.,* 944 F.2d 677, 687 (10th Cir.1991). Under Wyoming's version of the U.C.C., an action for breach of a contract for the sale of goods must be commenced within four years from the time the cause of action accrues.[6] Wyo.Stat. § 34–2–725 (1975 Supp.). Thus, argue the defendants, all claims for damages which accrued prior to December of 1989 are barred by the statute of limitations. Plaintiffs concede that pre–1989 claims are barred by the statute.[7] However, the defendants also maintain that Moncrief's claims for a contract price based upon the last regulated price plus production tax reimbursement are also time-barred because they claim that the contract price was repudiated.

 Generally, in a case such as this, with a continuing or installment contract, a cause of action accrues, and the statute of limitations begins to run on each occasion that a party fails to render performance in

---

**6.** Despite the parties' application of the 1991 version of the Uniform Commercial Code, the version of the code that was in effect in 1976 would govern most of the dealings between these parties. *See, Hill v. Mayall,* 886 P.2d 1188 (Wyo. 1994) (a contract is governed by the laws in effect at the time the contract is executed). However, the 1976 supplement to the Wyoming Statutes indicates that there were no changes in the U.C.C. as the legislature prepared for the recodification found in the 1977 statutes. The 1976 supplement directs the reader to the 1975 supplement where the applicable sections of the U.C.C. are found.

**7.** The failure to make proper monthly payments under a continuing or installment contract results in a new breach each month and the limitation period runs against each monthly cause of action separately. *See FDIC v. Galloway,* 856 F.2d 112 (10th Cir.1988). Thus, each month WBIPC failed to make a payment in accordance with Moncrief's interpretation constituted a new breach with a separate limitations period. Given the Wyoming four year limitations period and that this action was filed on December 13, 1993, Moncrief's claims for those months prior to December 15, 1989 are barred.

accordance with the terms of the contract. WBIPC contends that when it repudiated the contractual obligation for performance in 1986, it anticipatorily breached the contract, which gave Moncrief an immediate right to sue for that breach. The breach of an installment contract by repudiation does not create separate causes of action for each defaulted portion of the agreement. *See, e.g., Holt Drilling, Inc. v. Liberty Mut. Ins. Co.,* 664 F.2d 252, 256 (10th Cir.1981); 18 S. Williston, Law of Contracts § 2026C (3rd ed. 1978), but, in the case of anticipatory repudiation, the statute of limitations begins to run on the date of repudiation. *See American Cyanamid Co. v. Mississippi Chem. Co.,* 817 F.2d 91 (11th Cir.1987); U.C.C. § 2–610. WBIPC argues that it anticipatorily repudiated its contract with Moncrief by its letter of October 3, 1986, stating that it would pay a price based on a current market price for deregulated gas and, as a result, the statute of limitations began to run and has now expired.

In addition, the defendants assert that their payments of $1.75/MMBtu commencing in January of 1987 answered any question Moncrief could have had about the repudiation, since to the extent that the contract provided for a price equal to the last regulated price plus production taxes, the price obligation was thereby repudiated. WBIPC argues that Moncrief should have resorted to available U.C.C. remedies at that time. Specifically, defendants contend that Moncrief had the right to withhold further delivery of the gas, resell the gas to a third party and seek damages from WBIPC under Wyo.Stat. § 34–2–706 (1975 Supp.), or sue under Wyo. Stat. § 34–2–708 (1975 Supp.) to recover the difference between the market price and the contract price for the remaining deliveries under the contract. Defendants argue that because the plaintiffs failed to pursue these remedies within the four-year statute of limitations period, they are barred from seeking damages resulting from the repudiation and are also barred from seeking damages based upon Moncrief's asserted contract price of $3.845 plus taxes. Plaintiffs contend, however, that WBIPC's conduct did not constitute an anticipatory repudiation.

In *J.B. Service Court v. Wharton,* 632 P.2d 943, 945 (Wyo.1981), the Wyoming Supreme Court considered whether a letter advising that an agreement should be cancelled was an anticipatory breach. The court stated that "[a]n anticipatory breach of contract is one committed before the time has come when there is a present duty of performance, and is the outcome of words or acts evincing an intention to refuse performance in the future." *Id.* (citing 17 Am.Jur.2d Contracts § 448 (1964)). The court went on to describe what constitutes an anticipatory breach:

> [I]n order to predicate a cause of action upon an anticipatory breach, the words or conduct evidencing the breach must be *unequivocal and positive in nature.* An anticipatory breach of contract is not established by a negative attitude or one which indicates more negotiations are sought or that the party may finally perform.... [T]he refusal to perform must be of the whole contract or of a promise or obligation going to the whole consideration, and *it must be distinct, unequivocal, and absolute.*
>
> . . . .
>
> A mere request for a change in the terms or a request for cancellation of the contract is not in itself enough to constitute a repudiation.

*Id.* (citations omitted and emphasis added by court).

Moreover, both the United States Supreme Court and the Tenth Circuit Court of Appeals have stated that "[a]n offer to perform in accordance with the promisor's interpretation of the contract although erroneous, if made in good faith, is not such a clear and unequivocal refusal to perform as amounts to a renunciation giving rise to an anticipatory breach." *Kimel v. Missouri State Life Ins. Co.,* 71 F.2d 921, 923 (10th Cir.1934), cited in *Ricketts v. Adamson,* 483 U.S. 1, 19, 107 S.Ct. 2680, 2690, 97 L.Ed.2d 1 (1987) (Brennan, J. dissenting).

Based upon these well-accepted premises of the law of contracts and sales, this Court must conclude that there has been no anticipatory repudiation in this case for two reasons.

First, the defendants' 1984 and 1986 letters were merely offers to modify the contract's terms, but were not "clear and unequivocal" refusals to perform. In its June 24, 1984, letter MDU wrote as follows:

> MDU *believes,* therefore that the decontrolled gas price on January 1, 1985, should be *approximately* $2.25 per MCF.... As stated hereinbefore, this *suggested* decontrolled price will be reviewed with you at a meeting to be scheduled soon. (Emphasis added).

Defendants' Exhibit 8. This language is similar to the language used in the *J.B. Service Court* case where one party wrote, "I am writing to you ... to advise you that we should cancel the agency and Memorandum of Agreement.... Please let me hear from you immediately regarding this matter so that we can cancel the agreement." The court in that case concluded that this language did not constitute an anticipatory repudiation because it only spoke to cancellation of the contract in the future. *J.B. Service Court,* 632 P.2d at 944–45. In this case, the language of the 1984 letter merely speaks to the *future,* in less than positive and unequivocal terms. Moreover, the 1984 letter from David Price, a MDU vice-president, addresses modification of the existing contract, not its cancellation. For example the letter states, "MDU is purchasing such gas in accordance with the terms of the natural gas purchase contract(s) listed on Appendix A attached hereto." In the next paragraph, Mr. Price writes, "MDU believes, therefore, that the decontrolled gas price on January 1, 1985, should be approximately $2.25 per MCF, delivered, plus taxes." Defendants' Exhibit 8.

Similarly, the WBIPC letter of October 3, 1986, evidences only an attempt at modification of the contract price for 1987. That letter states:

> Current market conditions dictate that Williston Basin pay $1.75 per MMBtu for 1987 purchases of deregulated gas.... Should concurrence not be received prior to January 1, 1987, payment for purchases for deregulated gas during 1987 will be made at $1.50/MMBtu including all costs of production.... Should you wish to discuss the 1987 purchase plan, please feel free to contact either Dennis Haider or me.

Defendants' Exhibit 9. Again, this letter constitutes an offer to modify the contract price paid under the contract during the year of 1987 only. MDU does not purport to renounce unequivocally performance under the contract so that the entire contract would be repudiated, but its actions are more consistent with an amendment or modification of the contract. Had a dispute thereafter arisen over some other portion of the contract, the Court is confident that WBIPC would have claimed that it was still in effect.

Second, the price actually paid to Moncrief might plausibly be considered overpayment of the actual contract price. In other words, the defendants' conduct might be interpreted as "[a]n offer to perform in accordance with the promisor's interpretation of the contract." *Kimel,* 71 F.2d at 923. Defendants have argued that they paid more than was actually due under their interpretation of the terms of the contract. Defendants maintain that the contract price was the escalated base price of $1/MMBtu with a 1.5 cent/ MMBtu fixed escalation. If this were the case, then the defendants' notice that the "decontrolled gas price ... should be approximately $2.25/per Mcf" could hardly be considered an anticipatory breach. There simply is not a repudiation of the contract in their words or actions.

For these reasons, the Court holds that the defendants did not anticipatorily breach the contract with Moncrief. Accordingly, the statute of limitations with respect to the post–1989 claims has not run.

**B. Government orders and regulations make the contract impracticable to perform and create a force majeure.**

■ Exhibit A of the contract includes Article XI defining application of *force majeure* to the contract. That article provides that

> neither of the parties hereto shall be liable to the other for any interruption in delivery or receipt of gas, or any loss or detriment resulting from failure to perform any and all obligations hereby imposed, if such

failure shall be caused by ... act or order of public officials or agents of government ... beyond the control of the party so failing to perform.

Defendants suggest that the federal government's regulation of intrastate gas was a *force majeure*. However, there is a basic question whether the regulation of gas prices in general and intrastate gas in particular can, in fact, be considered a *force majeure*. "*Force majeure*" has been defined as "an irresistible force ... [a]n event that cannot be definitely foreseen or controlled." 46 A.L.R.4th 976 § 2(a).

■ In the mid–1970s, when the instant contract was signed, the energy industry was in a volatile condition and aggressive regulation by the federal government was more the rule than the exception.[8] *Force majeure* claims ordinarily result from unexpected Acts of God or war, but not from the acts of Congress. *See, Mobil Oil Exploration & Prod S.E., Inc. v. United Distribution Co.,* 498 U.S. 211, 111 S.Ct. 615, 112 L.Ed.2d 636 (1991) (discussion of approaches to regulation of natural gas sales). Therefore, the defendants cannot make a credible argument that expanded federal government regulation was so unforeseeable as to create a *force majeure. See, also Kaiser–Francis Oil Co. v. Producer's Gas Co.,* 870 F.2d 563, 565–566 (10th Cir.1989) (rejection of buyer's assertion of *force majeure* defense based on change in gas price).

■ Similar reasons prevent the application of the defense of impracticality. For a governmental regulation or order to make a duty impractical, its non-occurrence must have been a basic assumption of the contract. *See, Union Pac. Resources Co. v. Texaco,* 882 P.2d 212, 226 (Wyo.1994), citing Restatement (Second) of Contracts § 264 (1981). Ongoing and changing governmental regulation of the gas industry was the rule rather than the exception when the 1976 contract was drafted. Reasonable men, experienced in the gas industry, as were W.A.

Moncrief, his sons, and the agents of the defendants must have expected it. The Court must conclude that the non-occurrence of governmental regulations could not have been a basic assumption of the contract.

## C. Waiver of Claim and Estoppel.

■ Although the defendants assert the affirmative defenses of waiver and estoppel separately, they are essentially the same—that in addition to the statute of limitations, Moncrief's claims should be barred by his acceptance of payments without protest and delay in bringing this action. At the outset, the Court notes that the defendants made payments for eight years without any suspension of gas deliveries by Moncrief. Tex Moncrief objected to the 1985 and 1987 price changes, but he also accepted payments from Woods for the Moncrief gas without protest. "Waiver is the intentional relinquishment of a known right manifested in an unequivocal manner." *St. Paul Fire & Marine Ins. Co. v. Albany County Sch. Dist. No. 1,* 763 P.2d 1255, 1262 (Wyo.1988). "The necessary intent for waiver may be implied from conduct" but the "conduct should speak the intent clearly." *Murphy v. Stevens,* 645 P.2d 82, 93 (Wyo.1982). While a protest of insufficient payments can preserve a party's rights even when those payments are accepted, the payments made by the defendants were received by Moncrief for eight years without reoccurring protest of any kind. *See, Rupe v. Triton Oil & Gas Corp.,* 806 F.Supp. 1495, 1503 (D.Kan.1992) the payments made by the defendants were received without reoccurring protest.

Under the U.C.C., the waiver of contract rights is governed by Section 2–209 which states that attempts at modification may operate as a waiver. Wyo.Stat. § 34–2–209 (1975 Supp.). Moncrief and the defendants dispute whether W.A. Moncrief, and later, Tex Moncrief agreed to the redetermined price under the contract. However, they do

---

8. For a history of the federal regulation of the natural gas industry see Manning, *Federal Regulation of Pricing Provisions in Natural Gas Sales Contracts—From the Phillips Decision to the Natural Gas Policy Act of 1978,* 16 Hous.L.Rev. 1081 (1979) and Nordhaus, *Producer Regulation and the Natural Gas Policy Act of 1978,* 19 Nat.Resources J. 829 (1979). *See, also, Mobile Oil Exploration & Prod. S.E., Inc. v. United Distribution Co.,* 498 U.S. 211, 111 S.Ct. 615, 112 L.Ed.2d 636 (1991) (discussion of approaches to regulation of natural gas sales).

not dispute that, despite Moncrief's objections to the lowered price, the defendants did pay the redetermined price and those payments were received by the Moncriefs without an express reservation of rights. It is also undisputed that Moncrief continued to supply gas under the contract and only after the defendants repudiated the contract in 1993 did Moncrief bring suit. No matter how strenuous the objection at the time, Moncrief's continuing performance under the contract after the 1985 and 1987 price changes can constitute a waiver of his claim. *Wyoming Game and Fish Comm'n v. Mills Co.,* 701 P.2d 819, 823 (Wyo.1985). In *Western Transmission Corp. v. Colorado Mainline, Inc.,* 376 F.2d 470, 472 (10th Cir.1967) (an appeal from a breach of contract case from the District of Wyoming), the Tenth Circuit held,

> It is elementary that an innocent party may waive a breach of contract and continue performance on his part. If such performance is continued with no conditions attached, the innocent party has made an election and waived the breach. But the innocent party may continue performance on the condition that his right to subsequently assert the breach is preserved. In that event the right must not only be asserted but must be assented to by the other party. Also, even after an innocent party has elected to proceed under the contract, despite the breach by the other party, he may thereafter change his position and assert the breach if the other party has not relied on the election and changed his position because of such reliance.

*Id.* at 472 (footnotes omitted). The Court has received evidence that Moncrief grudgingly accepted the proposed contract price, but also that Moncrief never interrupted the supplying of gas to the defendants or reserved his rights to further payments. However, the Court has not been given evidence of Tex Moncrief's explicit preservation of his right or the defendants' assent to such preservation. Nor does the Court have before it any evidence of "intentional relinquishment of a known right" by the grandchildren, who are now also plaintiffs. In a somewhat similar situation the Tenth Circuit held that there was a factual question of whether there had been an intentional relinquishment of a party's claims. *Prenalta Corp. v. Colorado Interstate Gas Co.,* 944 F.2d 677, 685 (10th Cir.1991). Although it would appear that because the supply of gas continued uninterrupted, Moncrief's objections were insufficient to preserve his rights under the contract, the Court must conclude that the waiver issue is a factual question which is inappropriate for summary judgment.

■ As noted in *Western Transmission Corp.,* it is also required that a party seeking to assert waiver must prove that he relied on that waiver. *Western Transmission Corp.,* 376 F.2d at 473. The Tenth Circuit's reliance requirement is consistent with U.C.C. § 2–209. Wyo.Stat. § 34–2–209 (1975 Supp.) In a preeminent case interpreting U.C.C. § 2–209, Judge Posner of the Seventh Circuit held that reliance was a required element of waiver under the U.C.C. *Wisconsin Knife Works v. National Metal Crafters,* 781 F.2d 1280 (7th Cir.1986). While *Wisconsin Knife Works* presented a slightly different question because the contract involved in that case had a no modification clause, *Id.* at 1283, the decision is still valuable because of its insightful balance of the apparent internal inconsistencies found in § 2–209. Primary among those inconsistencies is § 2–209(2)'s enforcement of no modification clauses in contracts and § 2–209(4)'s allowance of waiver.

*Wisconsin Knife Works* resolved this inconsistency by requiring reliance by the breaching party on the non-breaching party's waiver. *Wisconsin Knife Works,* 781 F.2d at 1287. The requirement of reliance for a valid waiver is in accord with the Tenth Circuit's view of Wyoming law. *Western Transmission Corp.,* 376 F.2d at 473. Therefore, with a sufficient showing of reliance by the defendants, they might establish that Moncrief waived his right to higher payments by accepting the payments made by MDU or WBIPC. But, because questions of material fact about the plaintiffs' relinquishment and the defendants' reliance thereon still remain, the Court denies the defendants' Motion for Summary Judgment on this issue.

Finally, in *Prenalta,* the Tenth Circuit held that the Wyoming common law doctrine of voluntary payments [9] may be applicable where CIG voluntarily paid a commercially reasonable price for gas. *Prenalta,* 944 F.2d at 685. While this could become applicable to any claims of defendants that the price should have been upon deregulation should have become the price provided for in the contract ($1 per million Btu plus 1.5 cents per million Btu for each year from January 1, 1978 to 1985), thereby resulting in a claim that there had been an overpayment, the Court does not consider that doctrine applicable here.

### D. Amendment or novation of contract.

 Under Wyoming law there are four elements of novation: (1) a previous valid obligation; (2) an agreement of all parties to a new contract; (3) extinguishment of the prior contract; and (4) the validity of the new contract. *Lewis v. Platt,* 837 P.2d 91, 92 (Wyo.1992). For an existing contract to be superseded by a new agreement both parties must agree that the obligations of the second contract shall replace those of the first contract. *Id.* at 92.

 Defendants have not provided the Court with sufficient evidence that the parties did indeed agree to extinguish their prior agreement and replace it with a new contract. On the contrary, the passionate arguments by both parties about their 1976 contract demonstrate that a novation never occurred and that the original contract governs this dispute.

### E. Moncrief has been paid equal to or greater than the contract price.

Because this affirmative defense goes to the merits of the plaintiffs' claims, the Court will discuss it below.

### F. Accord and satisfaction.

Defendants' assertion of the defense of accord and satisfaction creates a difficult question of choice of law. While the Court has applied Wyoming's Uniform Commercial Code of 1976 to many of the issues presented in this case, Wyoming's U.C.C. did not have a provision on accord and satisfaction until 1991. Wyo.Stat. Section 34.1–3–311 (1991) (accord and satisfaction by use of instrument). Also, the Court has found a scarcity of law in Wyoming on accord and satisfaction.[10] Therefore, the Court considers Wyo. Stat. § 34.1–3–311 (1991) and its comments as persuasive authority on accord and satisfaction in Wyoming for payments made before 1991 and binding to payments made after 1991.[11]

9. *Fulton v. Des Jardins,* 67 Wyo. 517, 227 P.2d 240, 245 (1951), adopted the "universally recognized rules that money voluntarily paid under a claim of right to the payment, and with the knowledge of the facts by the person making the payment, cannot be recovered back on the ground that ... there was no liability to pay in the first instance."

10. Some Wyoming Supreme Court cases that discuss accord and satisfaction do so in the context of accident and other tort cases. Such transactions are not "commercial" and are therefore outside the analysis of Article III of the U.C.C. *See Jahn v. Burns,* 593 P.2d 828, 831 (Wyo.1979). Many other cases mention that the affirmative defense of accord and satisfaction had been pled but the Wyoming Supreme Court did not address it or mentioned it only in passing. *E.g. Nauman v. CIT Group/Equipment Financing, Inc.,* 816 P.2d 883, 884 (Wyo.1991) (despite assertion of accord and satisfaction, guarantors liable for balance of note following bankruptcy settlement with debtor); *Walker v. Graham,* 706 P.2d 278, 280 (Wyo.1985) (real estate vendor awarded earnest money after pur-

chaser breached contract); *Sharp v. Sharp* 671 P.2d 317, 320 (Wyo.1983) (husband's partial payment of child support did not qualify as accord and satisfaction of support debt); *Myer v. Miller,* 631 P.2d 441, 445 (Wyo.1981) (trial court's erroneous finding of accord and satisfaction harmless because judgment sustainable on other grounds); *Jim's Water Service, Inc. v. Alinen,* 608 P.2d 667, 671 (Wyo.1980) (court mentioned but did not address accord and satisfaction defense); *Oedekoven v. Oedekoven,* 538 P.2d 1292 (Wyo.1975) ("full payment on machinery" notation insufficient for accord and satisfaction of debt based on divorce decree); and, *Wallace v. Casper Adjustment Service,* 500 P.2d 72 (Wyo.1972) (court did not address accord and satisfaction defense after holding there was insufficient evidence to support $30 fee to collect $30 debt).

11. Official Comment three to Wyo.Stat. § 34.1–3–311 states, in part, "Section 3–311 follows the common law rule with some minor variations to reflect modern business conditions."

Defendants contend that even if the contract price is different from the amounts paid, Moncrief's claims are barred because there has been an accord and satisfaction. Under Wyoming law adopting the U.C.C. provisions governing accord and satisfaction, a claim is discharged if the person against whom the claim is asserted proves: (1) the person in good faith tendered a check to the claimant as full satisfaction of the claim; (2) the amount of the claim was unliquidated or subject to a bona fide dispute; (3) the check or an accompanying written communication contained a conspicuous statement to the effect that the instrument was tendered as full satisfaction of the claim; and (4) the claimant cashed the check. Wyo.Stat. § 34.1–3–311; *Jahn v. Burns,* 593 P.2d 828, 829 (Wyo.1979).

WBIPC argues that it sent monthly checks to Woods which was acting as the Moncrief's agent, in full satisfaction for the gas delivered during the prior month. WBIPC contends that the amounts paid represented a fair value for the gas in the approximate amount that WBIPC believed would be determined in a formal price redetermination. Thus, WBIPC asserts that it made a good faith tender in full satisfaction of the claims. WBIPC also contends that the purchase price was unliquidated because the parties had not negotiated a deregulated price. Next, WBIPC maintains that the June 1984 and October 1986 letters clearly indicated that the proposed market prices were intended as full satisfaction for the purchase of the gas. Finally, WBIPC asserts that in all instances its checks to Woods were cashed.

Moncrief argues that WBIPC does not satisfy the requirements for accord and satisfaction because it did not make a conspicuous statement indicating that its checks were tendered in full satisfaction of the claim. Moncrief maintains that because nowhere on WBIPC's remittance documents does it say "in full and final payment" or "payment in full satisfaction" or other words to that effect the conspicuousness requirement cannot be established.

While these "magic words" written on a check or remittance will notify the recipient that the payor tendered the instrument as full satisfaction of the claim, those words are not the sole means by which one can satisfy the conspicuous notification requirement. Wyoming Statutes, Section 34.1–3–311 comment seven, states in pertinent part that "[a] claimant knows that a check was tendered in full satisfaction of a claim when the claimant 'has actual knowledge' of that fact." Thus, WBIPC could have given conspicuous notice that its remittance was intended as payment in full without writing the magic words on its check. The Court holds that there is a genuine issue of material fact regarding the question of whether the letters written by WBIPC and its statements accompanying its checks to Woods satisfy this requirement for accord and satisfaction, thus, summary judgment on this issue cannot be granted.

In addition, Moncrief argues that WBIPC stopped paying Woods, Moncrief's agent, in April of 1991. From April of 1991 through June of the same year, WBIPC paid Sonat Exploration Company and from July 1991 through October of 1993, WBIPC paid Kerr–McGee Corporation for Powell II Unit production. Moncrief contends that because he never appointed either Sonat or Kerr–McGee as his agent, there can be no accord and satisfaction with respect to payments made to them. This Court is not persuaded. If Sonat and Kerr–McGee were acting as Moncrief's agents in a similar manner as Woods had previously, there was no reason for WBIPC to expect that they were not his agents. Comment seven to Wyo.Stat. § 34.1–3–311 (1991) explains that when the claimant is an organization, "it has knowledge that a check was tendered in full satisfaction of the claim when that fact is 'brought to the attention of the individual conducting that transaction, in any event when it would have been brought to his attention if the organization had exercised due diligence.'" *Id.*

Moncrief's contention that Sonat and Kerr–McGee had no authority to accept payments also raises issues of apparent authority. Apparent authority, also known as authority by estoppel, occurs where the actions of a principal induce a third party to rely on the authority of an agent and that agent does not have the necessary authority. Restate-

**1512**

ment 2d Agency § 8 (1958). The Wyoming Supreme Court has held, "[a] principal is bound by the acts of an agent performed with apparent authority where the third person acted upon reliance of apparent authority held out by the principal." *Kure v. Chevrolet Motor Div.,* 581 P.2d 603, 609 (Wyo.1978). See, also, Wyo.Stat. § 34–3–403 (1975 Supp.) (no particular form of appointment necessary to establish authority of party signing note). Thus, Moncrief's assertion that Sonat and Kerr–McGee did not have authority to accept payments is contradicted by Moncrief's lack of protests which in turn creates a question of material fact about the apparent authority to those agents.

For these reasons, the Court concludes that there are also genuine issues of material fact regarding the transactions with Sonat and Kerr–McGee and whether the payments made to Moncrief via these operators constituted accord and satisfaction. Accordingly, summary judgment cannot be granted on this issue.

### G. Plaintiffs are not the real party in interest.

Defendants have made numerous and changing arguments that Tex Moncrief is not the real party in interest to the disputed contract. Most of these arguments involve the merits of the Wyoming and Texas probate cases involving W.A. Moncrief's estate. The Texas probate court, as the domiciliary estate, and the Wyoming probate court as the ancillary estate, properly have jurisdiction, but of course the Wyoming court which has the jurisdiction of the *res,* the working interests in Wyoming minerals, has the exclusive jurisdiction to determine the ownership therein and the disputes of the heirs thereto. *See In re Ray's Estate,* 287 P.2d 629, 634 (Wyo.1955) (adopting doctrine of *lex loci rei sitae,* the law of the place where the subject matter is located governs); Wyo.Stat. Section 22–101 and Bancroft's Probate Practice 2d § 33. As a result, judgment

must be properly reserved for that court concerning the cross-claims of the realigned plaintiffs against "Tex" Moncrief. However, under Wyoming law the executors of W.A. Moncrief's estate have the authority to pursue this action. Wyo.Stat. § 2–7–104. (personal representative of estate may bring contract action to assert interests of estate). The executors under Wyoming law have the right to possession of the assets of the estate for the purposes of administration, even though the title to the working interest has devolved to the grandchildren and their trusts, as the grantees of the devisee of W.A. Moncrief, deceased. The executors of the estate of W.A. Moncrief, deceased, may continue this action pending a decision of the Wyoming probate court which closes the estate and decides the rights of his purported heirs. Until the probate is completed and the estate of W.A. Moncrief, deceased, is closed, Tex Moncrief, as executor, is a party in interest in this matter, together with his co-executors, the grandchildren and their trusts. Defendants' motion for summary judgment on this matter is therefore denied.[12]

### H. The Doctrine of Laches

Laches is an equitable remedy, the elements of which are: (1) inexcusable delay, and (2) injury, prejudice, or disadvantage to the defendant or others. *See Moncrief v. Sohio Petroleum Co.,* 775 P.2d 1021 (Wyo.1989); *Big Piney Oil & Gas Co. v. Wyoming Oil and Gas Conservation Comm'n.,* 715 P.2d 557 (Wyo.1986); *Harnett v. Jones,* 629 P.2d 1357 (Wyo.1981). WBIPC contends that the first element has been satisfied because as early as June 24, 1984, Moncrief had notice that WBIPC intended to pay a market price of approximately $2.25 per Mcf for the Powell II Unit gas upon deregulation. WBIPC argues that Moncrief's delay in presenting his claims for a price of $3.845 per MMBTU plus tax reimbursement and the filing of this suit is inex-

---

**12.** Tex Moncrief's various roles in this litigation do raise serious questions about likely conflicts of interest. *E.g. Rose v. Rose,* 849 P.2d 1321 (Wyo.1993) (rejection of claim of conflict because individual was both representative and beneficiary of decedent's will.) An example of this con-

flict is Tex Moncrief's role as co-executor of his father's estate while claiming that he was a silent partner in many of his father's investments. This is a matter that the Wyoming probate court will have to consider after it has been properly addressed by the parties.

cusable. Defendants also argue that the second element of laches has been met because during the time that WBIPC purchased gas from Moncrief, it resold the gas to customers at prices that were regulated by the Federal Energy Regulatory Commission and were directly tied to the prices paid by WBIPC. Defendants maintain that any payments for out-of-period adjustments from prior gas sales must have been made by July 31, 1994, pursuant to FERC Order No. 636, and that because it is impossible that a final order will be entered in this proceeding prior to that date, it is at risk of losing some or all of any amounts that could be awarded to Moncrief.

■ It is a well-accepted principle that the doctrine of laches is particularly well-suited for application in the oil and gas and mining areas due to the nature of these property interests. *See, e.g., Patterson v. Hewitt,* 195 U.S. 309, 321, 25 S.Ct. 35, 38, 49 L.Ed. 214 (1904); *Twin–Lick Oil Co. v. Marbury,* 91 U.S. (1 Otto) 587, 592–93, 23 L.Ed. 328 (1875); *Amerada Petroleum Corp. v. Rio Oil Co.,* 225 F.Supp. 907 (D.Wyo.1964); *Torgeson v. Connelly,* 348 P.2d 63 (Wyo. 1959); *Eblen v. Eblen,* 234 P.2d 434 (Wyo. 1951). Generally, however, the doctrine of laches has been applied to parties who sit back or wait to assert their rights until the value of their rights has been demonstrated by the other party.

For example, in *Merrill v. Rocky Mountain Cattle Co.,* 26 Wyo. 219, 181 P. 964 (1919), the Wyoming Supreme Court, relying partly upon the doctrine of laches, affirmed the denial of specific performance to convey certain lands upon which oil had been discovered. The court noted that:

> [W]ith knowledge of the facts, the plaintiffs waited before asserting their right here claimed until the value of the land for oil purposes had been demonstrated by the defendant Phelps through his lease to said operating company, allowing their decision to insist upon what they now claim as their right to depend upon the success or failure of the drilling operations carried on at the expense of others.

*Id.* 181 P. at 975. In *Madrid v. Norton,* 596 P.2d 1108, 1120 (Wyo.1979), the court similarly stated that "[t]here is an inherent injustice in one purportedly holding a right to assert an ownership in property to voluntarily await the propitious event and then decide, when the danger which has been at the risk of another is over, to come in and claim a share of the profits." Again, in *Amerada Petroleum,* this Court held that the defendants' hostile claims against certain Wyoming property were barred by laches where the defendants had known for years of the existence of the property but, thinking it worthless, delayed prosecuting their claims until approached by an oil company regarding mineral leasing. *Amerada Petroleum,* 225 F.Supp. at 914. In that case, Judge Kerr wrote: "[t]he rule of laches must foreclose tardy claimants from asserting any rights in property when they sit quietly by and permit some one else 'to bring into form and being a latent property right' which only in recent years appeared to have considerable or potential value." *Id.* (citing *Hodgson v. Federal Oil and Dev. Co.,* 285 F. 546 (Wyo.1922)).

This case, however, is not a one where Moncrief has waited in speculation for a change in circumstances guaranteeing him a superior position before suing. What is disputed here is the price term which is contained in the contract. This term, at least arguably, may have been modified by certain economic factors, a question which is at the heart of the issue here.

■ Laches should not apply when a party merely asserts in good faith what he believes to be his rights under a contract, where any delay which does not toll the statute of limitations is excusable and does not prejudice the party against whom his rights are asserted. *See Moncrief v. Sohio Petroleum Co., supra; Big Piney Oil & Gas Co., supra;* and *Harnett, supra,* (requiring inexcusable delay and prejudice for application of affirmative defense of laches). The delay in this case may be excusable. Wyoming law courts have sometimes added a third requirement for laches: knowledge of the claim. *Torgeson,* 348 P.2d at 69. As this Court reasoned in its discussion of the affirmative defense of waiver, there are questions of material fact regarding Tex Moncrief's knowledge of his claim, and certainly there is

a serious problem, which has not been addressed by the parties, of how much the co-executors and the grandchildren, and their trustees, knew and when they knew it.

Moreover, the delay in bringing this action may not have prejudiced the defendants. Any prejudice to the defendants may arise not because of the delay, but because the suit was filed in the first place. Defendants state that if it had been determined that they were required to pay a higher price for the gas in question here, they could have passed the price on to its customers and that any adjustments for prior gas sales must have been made by July 31, 1994. This type of injury is one that is typical in breach of contract gas cases. The Court concludes that the record must be developed further regarding other remedies available to Defendant MDU, and as a result, the defendants' motion for summary judgment on this issue is denied.

### III. The Applicable Contract Price

Because the Court concludes that the defendants' affirmative defenses create questions of material fact as to the affirmative defenses of waiver, accord and satisfaction and laches, the Court will proceed to the heart of the parties' dispute: the applicability of § 105(b)(3) of the NGPA to the contract price.

The controversy between the parties centers on the price escalation clause found in Section 7.4 of the contract and the applicability to it of intrastate gas regulations. Section 7.4 of the contract reads:

If the Federal Power Commission, or any successor or other *governmental authority* having jurisdiction in the premises, *shall at any time hereafter prescribe or permit, for the pricing area* in which the properties are located, *a higher just and reasonable area rate* including all adjustments *for the same type of gas* as committed hereunder than the price herein provided to be paid, *then the price hereunder shall be increased*, effective as of the date such higher rate is prescribed, *to equal such higher rate.* (Emphasis added).

Moncrief argues that the intention and purpose of this section was to raise the contract price to the highest regulated price for gas. Defendants argue that the section was only intended to track interstate gas prices, because at the time the contract was signed and negotiated intrastate gas was not regulated. The ultimate question before the Court is whether this escalation clause is triggered by § 105(b)(3) of the Natural Gas Policy Act (NGPA) which set a ceiling price for intrastate gas prices. 15 U.S.C. Section 3315(b)(3).

Because jurisdiction in this matter is based on diversity of citizenship and the contract deals with the production of Wyoming gas, the sale of which takes place in Wyoming, the Court must apply the substantive law of the forum state of Wyoming. Wyo.Stat. Section 34–21–105 (1977); *Cherry Creek Dodge, Inc. v. Carter,* 733 P.2d 1024 (Wyo.1987). Oil and gas contracts and leases should be treated under doctrines of contract law. *State v. Moncrief,* 720 P.2d 470 (Wyo. 1986). Under Wyoming law, the purpose of contract interpretation is to determine the true intention and understanding of the parties. *State v. Pennzoil,* 752 P.2d 975, 978 (Wyo.1988); *Amoco Prod. v. Stauffer Chem. Co. of Wyo.,* 612 P.2d 463, 465 (Wyo.1980). If the contract is in writing and its language is clear and unambiguous, that intent is determined solely from the contract language. *Id.* The existence of an ambiguity as well as the interpretation and construction of a contract is a matter of law for the Court. *Id.* An ambiguous contract is one which is "obscure in its meaning, because of indefiniteness of expression, or because a double meaning is present." *Bulis v. Wells,* 565 P.2d 487, 490 (Wyo.1977). In determining whether or not there is any ambiguity which would justify an examination of extrinsic evidence, the Court must look to the language of the document itself. *State v. Pennzoil, supra.* The Court finds no ambiguity in the pricing provisions (Article VII) of this contract. The Court also notes that the contract is for the sale of goods and is therefore governed by the Uniform Commercial Code as codified in Wyoming. *Prenalta Corp. v. Colorado Interstate Gas Co.,* 944 F.2d 677, 687 (10th Cir.1991).

### A. The Applicability of Section 105(b)(3).

■ The key language of Section 7.4 of the contract is "higher just and reasonable area rate ... for the same type of gas as committed hereunder" because such a rate triggers the price escalation. At the outset, the Court must consider the defendants' contention that § 105(b)(3) should not apply because no regulations of *intrastate* gas had occurred when the contract was signed and, as a result, only *interstate* gas regulations should be applicable. But, the plain language of Section 7.4 of the contract does not distinguish between interstate and intrastate regulations; it speaks only of "a higher just and reasonable area rate including all adjustments for the same type of gas committed hereunder." Whether that rate is prescribed or permitted by governmental interstate or intrastate regulations wouldn't matter if it was a "higher just and reasonable rate ... for the same type of gas.". The Court discounts that argument because of the language of the contract which is unambiguous and invokes an applicable governmental "just and reasonable area rate", without distinguishing between interstate and intrastate gas. *See, True Oil Co. v. Sinclair Oil Corp.,* 771 P.2d 781, 790 (Wyo.1989) (if the language of a contract is clear and unambiguous then it governs the parties' intent). The Court concludes that the instant contract is subject to the intrastate regulation found in Section 105(b)(3) of the NGPA, but must next determine whether the "maximum lawful price" therein specified is a "just and reasonable area rate."

Section 105 of the NGPA provides, in part

**Sec. 105. Ceiling Price For Sales Under Existing Intrastate Contracts.**

(a) APPLICATION.—The maximum lawful price computed under subsection (b) shall apply to any first sale of natural gas delivered during any month in the case of natural gas, sold under any existing contract or any successor to an existing contract, which was not committed or dedicated to interstate commerce on November 8, 1978.

15 U.S.C. § 3315(a). The NGPA became effective on November 8, 1978. The instant contract was signed in 1976 and involved natural gas committed to intrastate commerce before then. Therefore § 105 covers the gas committed under the instant contract.

Part (b)(3) of § 105 is entitled "Price increases resulting from indefinite price escalator clauses" and defines indefinite price escalator clauses as

any provision of any contract—

(i) which provides for the establishment or adjustment of the price for natural gas delivered under such contract by reference to other prices for natural gas, for crude oil, or for refined petroleum products; or

(ii) which allows for the establishment or adjustment of the price of natural gas delivered under such contract by negotiation between the parties.

15 U.S.C. § 3315(b)(3)(B) The rest of § 105 sets the maximum lawful price for contracts with such indefinite price escalator clauses.

■ While the unambiguous language found in Section 7.4, the governmental price escalator clause, and Section 7.6, the favored nations clause, fits well within the definition of "indefinite price escalator clause" as found in § 105(b)(3)(B), the ultimate question before the Court is whether the "maximum lawful price" set by § 105(b)(3) is a "just and reasonable area rate" provided for in Section 7.4 of the contract.

The Court concludes that Section 105(b) establishes a ceiling price, but did not establish a just and reasonable area rate. The distinction between a ceiling price and a "controlled" or area price was explored by the Fifth Circuit in *Pennzoil v. FERC,* 645 F.2d 360 (5th Cir.1981), *cert. denied,* 454 U.S. 1142, 102 S.Ct. 1000, 71 L.Ed.2d 293 (1982). According to the Fifth Circuit,

[a] ceiling price sets a maximum price above which the sales price cannot go, but at the same time does not set a minimum; the sales price, given sufficient economic conditions, can be established at a point below that ceiling. *A ceiling price must be distinguished from a 'controlled' price. The latter is both a maximum and a minimum allowable price. With price ceilings,*

*as opposed to controlled prices, the parties are free to contract for sale prices at or below, but not above, the ceiling.* Similarly, the parties may adopt amendments increasing or decreasing the contract price so long as the amended price does not exceed the ceiling. Upward contractual escalation of the contract price does not convert the ceiling price into a price floor, but is instead consistent with the existence of a cap on price increases. Consumers' contention otherwise is inconsistent with past FPC [Federal Power Commission, the predecessor of the FERC] price regulation, since area rate clauses escalated contract prices to newly established, higher FPC ceilings.

*Id.* at 372. (Emphasis added). The Fifth Circuit's analysis, which is discussed in more detail below, led that court to conclude that the Natural Gas Policy Act's (NGPA) price ceilings neither precluded nor required area rate clauses to match NGPA ceiling prices. *Id.* Much of the complexity of the questions before this Court and the court in *Pennzoil* is based on the differing purposes behind the NGPA's ceiling rates and area rates set by the FPC. The question then becomes whether the parties intended the NGPA ceiling price to trigger the area rate clause.

For the answer to this question, the Court must explore the parties' intent behind the contract, the language and purpose of the Natural Gas Policy Act, and the commercial circumstances surrounding these events. Such an inquiry is proper even though the court holds the contract to be unambiguous. *See, Prenalta Corp. v. Colorado Interstate Gas,* 944 F.2d 677, 688 (10th Cir.1991) (Tenth Circuit application of Wyoming law holding "[a] contract, however, does not exist in a vacuum; its terms must be understood in light of the commercial context in which it was drawn.") and Wyo.Stat. §§ 34–1–205, 34–2–208 (1975 Supp.) (course of dealing and trade usage of terms may be used to interpret an agreement).

The contract is a balance between the buyer's desire for a long-term stable supply and the seller's desire for a flexible price which tracks the market price. Here, the balance

that was achieved was a long-term contract that allowed the contract price to change.

The Court must also consider the regulatory scheme of the gas market before and during the contract. When the parties signed their contract in 1976, natural gas was regulated on the interstate market but not the intrastate market. William P. Schwartz, *Indefinite Price Escalation Clause in Natural Gas Sales Contract; Unconscionable and Contrary to Public; A Comment on Kerr McGee Corp. v. Northern Utilities, Inc.,* 17 Land & Water L.Rev. 257, 258 (1982). The result was inflated prices at the intrastate level and inflated demand at the interstate level. *See, generally,* Breyer and MacAvoy, *The Natural Gas Shortage and the Regulation of Natural Gas Producers,* 86 Harv. L.Rev. 941 (1973). However, shortly after the contract was signed, Congress passed the broad ranging Natural Gas Policy Act, codified at 15 U.S.C. Section 3315 *et seq.* For the first time the NGPA extended federal price regulation to sales of intrastate gas. NGPA § 105, 15 U.S.C. Section 3315. There is of course no dispute about the defendants' payment of the proper amount during this period of regulation.

But, pursuant to the NGPA, the regulation of both interstate and intrastate gas ended on December 31, 1984. 15 U.S.C. § 3331. Despite the overall scheme of deregulation Congress did provide a ceiling for certain "indefinite price escalators" in intrastate gas contracts through which the reader is referred to in § 105(b)(3) of the NGPA. 15 U.S.C. §§ 3331, 3315(b)(3). Thus, even though Congress was deregulating gas prices, it continued some limits through its restrictions on some price escalator clauses in intrastate contracts such as the instant one. This conflict in the Natural Gas Policy Act—an overall scheme of deregulation coupled with a regulated ceiling price—creates an ambiguity within the statute, which clouds the picture of Congress' intent. If there is sufficient ambiguity in legislation, it becomes appropriate to examine the legislative history, *United States v. Abreu,* 962 F.2d 1447, 1450 (10th Cir.1992) (en banc), *vacated on other grounds,* —— U.S. ——, 113 S.Ct. 2405, 124 L.Ed.2d 630 (1993), as well as the overall

policy behind the NGPA. *Crandon v. United States,* 494 U.S. 152, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990).

The legislative history of the NGPA is valuable in determining whether the rate set by § 105(b)(3) of the NGPA was a "just and reasonable area rate." The Natural Gas Policy Act prohibited indefinite price escalation clauses in interstate contracts, and instead provided "area rates" as the maximum price for interstate gas sales. Williams and Meyers, *Oil and Gas Law,* Vol. 8, p. 58. But at the time of the instant contract in 1976, there was no such ban on indefinite escalator clauses in intrastate gas contracts. When gas was deregulated, Congress was concerned about intrastate gas prices becoming inflated by escalator clauses that were suddenly released. 124 Cong.Rec. 38,365 (1978) (Statement of Rep. Dingell). As a result, Congress drafted an absolute limit for such escalator clauses through § 105(b)(3) of the NGPA. According to the Conference Committee Report, this limitation would apply to deregulated gas but was not intended to trigger "just and reasonable" clauses tied to the National Gas Act. 1978 U.S.C.C.A.N. 8999–9000. That Conference Committee Report indicates that the purpose of § 105(b)(3) was not to set an "area rate" but was instead intended as an outer limit to the indefinite price escalator clauses that were to come into effect after deregulation of intrastate gas. That is consistent with the federal regulatory scheme which has historically constrained prices. David Crump, *Natural Gas Price Escalation Clauses,* 70 MINN.L.REV. 61 (1985).

 Plaintiffs argue, essentially, that Congress gave deregulation with one hand but it took it back with the other by setting an area rate as a contractual price through § 105(b)(3). Under that reading of the NGPA, the Court would have to disregard Congress' unambiguous intent in 15 U.S.C. § 3331(a) to deregulate and return gas prices to the free market. When two sections of legislation contradict each other, the Court should give them the reading that gives them both effect. *Homeland Stores, Inc. v. Resolution Trust Corp.,* 17 F.3d 1269, 1273 (10th Cir.1994). By holding that Section 105(b)(3) merely sets a ceiling price, the Court believes that the Congressional intent of both § 3331(a) and § 105(b)(3) are preserved and enforced.

In support of the argument that § 105(b)(3) sets an applicable "area rate," Moncrief cites *Pennzoil Co. v. FERC,* 645 F.2d 360 (5th Cir.1981), *cert. denied,* 454 U.S. 1142, 102 S.Ct. 1000, 71 L.Ed.2d 293 (1982), where the Fifth Circuit concluded that the NGPA did not preclude area rate clauses from escalating to the maximum lawful price allowed but also did not require that area rate clauses escalate to NGPA ceilings. *Id.* at 378–379. Moncrief asks the Court to find that § 105(b)(3), merely by setting out an absolute ceiling for intrastate gas, created an "area rate" or more specifically, a "just and reasonable area rate" as prescribed by Section 7.4 of the contract. The Court must reject this finding because the Conference Committee Report and the goal of deregulation suggest that § 105(b)(3) was an intrastate limit on the price escalator clauses, not a trigger of them.

In *Mesa Petroleum Co. v. Kansas Power & Light,* 630 P.2d 1129 (Kan.1981), *cert. denied,* 455 U.S. 928, 102 S.Ct. 1292, 71 L.Ed.2d 472 (1982), the Supreme Court of Kansas was presented an argument similar to the plaintiffs' by gas producers who asked that the court reconsider one of its recent decisions in light of the Fifth Circuit's decision in *Pennzoil.* The Kansas Supreme Court weighed both the *Pennzoil* case and the NGPA and it concluded that the mere establishment of NGPA's ceiling prices did not trigger price escalator clauses. *Id.* at 1130. The contract before the Kansas State Supreme Court provided for an "escalation when a governmental authority shall 'prescribe by law' any price which is higher" which is similar to, if not stronger than, the language of the instant contract. *Id.* Although the instant contract also included the term "permit," it is tied to the existence of a "just and reasonable area rate." The Kansas Supreme Court, after weighing *Pennzoil* and the NGPA, concluded that an "area rate" clause was not triggered by the NGPA's ceiling rates. *Id.* 1130.

The United States Supreme Court had occasion to speak to the Kansas Supreme

Court's analysis in *Mesa Petroleum* and concluded that the state court's reading of § 105(b)(3) of the NGPA was "unassailable." *Energy Reserves Group v. Kansas Power & Light*, 459 U.S. 400, 420, 103 S.Ct. 697, 709, 74 L.Ed.2d 569 (1982). After considering the Kansas Supreme Court's interpretation of § 105 in another case, the United States Supreme Court concluded, "[w]e agree that, as a matter of federal statutory interpretation, the Act does not trigger [governmental price escalator] clauses automatically." *Id.* at 419, 103 S.Ct. at 709. The Supreme Court then noted that, subject to FERC regulations, the question of whether the maximum lawful price of the NGPA triggers intrastate escalation clauses is reserved for state law. *Id.* Therefore, this Court turns to Wyoming state law for guidance on this issue.

The closest that the Wyoming courts have come to considering the question before the Court was in *Amoco Prod. v. Stauffer Chem. Co. of Wyoming.*, 612 P.2d 463 (Wyo.1980). The contract in *Amoco Prod.* included an escalator clause allowing the contract price to match the "ceiling price" as "prescribed or approved" by the FPC or any successor governmental agency. *Id.* at 464. The Wyoming Supreme Court concluded that the contract was unambiguous and that the contract price was the highest lawful price. *Id.* at 468. In its decision, the Wyoming Supreme Court overruled the trial court's reliance on *C.F. Braun & Co. v. Oklahoma Gas & Elec. Co.*, 603 F.2d 132 (10th Cir.1979), where the escalation clause was based not on a "ceiling price" but on an "area rate price." *C.F. Braun*, 603 F.2d at 132. A comparison of the contracts involved in *Amoco Prod.* and *C.F. Braun & Co.* sheds light on the applicability of the NGPA's ceiling price to the instant contract under Wyoming law.

In the instant case, the disputed contract is more like that in *C.F. Braun* than the contract in *Amoco Prod.* In *C.F. Braun* the price escalator clause was tied to the "area price" and the Tenth Circuit held that the contract price was set by Federal Power Commission's regulated price. *C.F. Braun*, 603 F.2d at 133. The contract in *Amoco Prod.*, on the other hand, tracked the "price ceiling" set by federal regulations. *Amoco*

*Prod.*, 612 P.2d at 464. Here the escalation clause in Section 7.4 is tied to the "area rate," not the "price ceiling" like the contract found in *Amoco Prod.* If the instant contract had the language found in the *Amoco Prod.* contract, Moncrief's argument would be far more persuasive and § 105(b)(3) would likely be applicable. But, given the language in the disputed contract, this Court concludes that the price escalation clause would have to be tied to the "ceiling price" for the seller to receive the benefit of § 105(b)(3). Thus, the Wyoming law found in *Amoco Prod.* supports the · defendants' interpretation of the contract.

Also, because Wyoming law gives limited guidance to the contractual language, the Court has considered *City of Farmington v. Amoco Gas Co.*, 777 F.2d 554 (10th Cir.1985). In that case Plaintiff City of Farmington, New Mexico sued Defendant Amoco for alleged overcharges. Amoco argued that the price escalation clause in its contract was triggered by the ceiling prices set by the NGPA. *Id.* at 563. The Tenth Circuit concurred with the Fifth Circuit's holding in *Pennzoil* that the NGPA allowed, but did not require, contract prices to rise the maximum lawful amount. *Id.* at 563–564. The Tenth Circuit further agreed that the applicability of the ceiling price depended on the particular language of the contract. *Id.* The court then examined the language of the contract, which is instructive here because of its similarity to the instant contract. The price escalator clause in *Amoco* stated, in part,

Accordingly, should the FPC, or any successor governmental authority having similar jurisdiction, allow by order following hearing, or by settlement, for the San Juan Basin Area . a *just and reasonable area price* higher than [24.0 cents] per MCF for gas of this contract vintage, then the price to be paid by Buyer to Seller for gas under this contract shall be increased as hereinabove provided to be effective on the date such order is issued or settlement agreement approved by the Commission.

*Id.* at 557. (Emphasis added). Defendant Amoco argued that the word "allowed" meant "permit, approve or, fix." Amoco's meaning was therefore much the same as the

"prescribe or permit" found in the instant contract. Amoco then argued that the ceiling rates "allowed" by the NGPA should trigger its escalation clause. *Id.* at 564.

The Tenth Circuit rejected Amoco's argument and reasoned that the escalation clause was not triggered by any higher price allowed by the Federal Power Commission, but *only* by a "just and reasonable area price" for the same vintage of gas. *Id.* The language in the contract before the Tenth Circuit is quite similar to Section 7.4 of the instant contract which not only has the "just and reasonable area" rate or price provision, but also requires that the rate be for "the same type of gas committed hereunder." Under *City of Farmington*, specific language must invoke a price ceiling, as it did in *Amoco Prod.* The language of the instant contract is like that in *City of Farmington*, and is tied to a "just and reasonable area rate" and is not triggered by a ceiling rate.

Furthermore, giving § 105(b)(3) the narrow application proposed by the defendants supports the overall goal of Congress' plan of deregulation: returning prices to a relatively free market. In *FERC v. Martin Exploration Management Co.*, 486 U.S. 204, 108 S.Ct. 1765, 100 L.Ed.2d 238 (1988), the Supreme Court considered an issue similar to this one. The Tenth Circuit had previously held that under the NGPA, when gas could be subject to both a regulated price and deregulated price, the higher of the two should govern. *See, Martin Exploration Management Co. v. FERC,* 813 F.2d 1059 (10th Cir.1987). In rejecting this argument, the Supreme Court reasoned,

> Indeed, the Court of Appeals' reading is contrary to the whole thrust of the Act, for it has the effect of turning a statutory scheme of price ceilings and deregulation into a system of price supports for producers. There is no evidence that Congress had any intent to create such a producer-assistance program. The Act was a compromise: those supporting deregulation were opposed only by those who thought deregulation would allow producers to charge excessive prices. Not one participant in the legislative process suggested that producers should receive higher prices

than deregulation would afford them. The operating assumption of Congress was that deregulation was the most favorable regime for gas producers under consideration.

*FERC v. Martin Exploration Management Co.,* 486 U.S. at 210–211, 108 S.Ct. at 1769–70. Plaintiffs' reading of the NGPA, in a conflicting scheme of deregulation and price ceilings by asking the Court to impose the highest possible price as a "just and reasonable area rate" is comparable to the Tenth Circuit's view which was expressly rejected by the Supreme Court.

Additionally, part of the Tenth Circuit's opinion in *Martin Exploration Management Co. v. FERC,* that was not appealed was a discussion of the applicability of § 105(b)(3). *Martin Exploration,* 813 F.2d at 1072–1074. The Tenth Circuit's analysis of § 105(b)(3) dealt with a different issue than the one before this Court, but the descriptive words used by the appellate court are instructive. During its analysis, the Tenth Circuit described § 105(b)(3) as a "special rule" that was intended as a "limitation" to price escalation clauses, not a trigger of them. *Id.*

After a review of these authorities, the Court concludes that the "maximum lawful price" determined under § 105(b)(3) is not a "higher just and reasonable area rate" required by Section 7.4 for intrastate gas but instead is an absolute ceiling to area rate, favored nations and other indefinite price escalator clauses.

■ Moncrief asks the Court to consider the deposition testimony of Mr. Claude Pickard, who was a negotiator for Montana–Dakota when the instant contract was drafted, and who said that the intent was to give the seller the highest possible price. Among this testimony is Mr. Pickard's statement that he had no recollection of how Section 7.5 was to operate or whether or not it was intended to prohibit price decreases. However, Mr. Pickard's testimony contradicts the unambiguous language of the contract in Section 7.4 and the Court's consideration of it would violate the parol evidence rule. Wyo.Stat. § 34–2–202 (1975 Supp.).

■ Wyoming's U.C.C. allows the Court to consider the parties' "course of dealing" and "course of performance" to explain or supplement, but not contradict the language of the contract. Wyo.Stat. § 34–2–202(a) (1975 Supp.). The Court need not find the contract language to be ambiguous to consider such evidence. See, Wyo.Stat. § 34.1–2–202 (1991), comment 1(c), and White and Summers, *Uniform Commercial Code,* § 3–3 at 122 (3d Ed.1988).

Section 7.5 of the contract provides that "[i]n the event the regulation of the price at which natural gas is sold in interstate commerce ceases" the parties shall negotiate a new contract price. The only limit to the new negotiated price is that it could not be lower than that "otherwise applicable" under the contract. If Moncrief's reading of § 105(b)(3) were correct, the parties would not have needed to renegotiate the contract price in 1985 when deregulation occurred because § 105(b)(3) would have governed the new contract price.

The conduct of the parties, however, was quite different. The affidavit of Ronald D. Tipton, the President and Chief Executive Officer of Defendant Williston Basin Interstate Pipeline Company, indicates that he met with W.A. Moncrief and Tex Moncrief to determine the deregulated contract price. Although the parties agreed to a post-regulation price, the Moncriefs never suggested that the applicable price was set by § 105(b)(3). Indeed, neither Tex Moncrief, nor others representing the Moncrief interests argued that § 105(b)(3) set the contract price until their letter of August 9, 1993, after the First Amended Complaint was filed. Following deregulation, WBIPC proposed and began paying a new contract price which was cashed, albeit reluctantly, by the plaintiffs. On June 24, 1984, in anticipation of deregulation, Defendant MDU wrote to Moncrief:

> MDU believes, therefore that the decontrolled gas price on January 1, 1985, should be approximately $2.25 per MCF.... As stated hereinbefore, this suggested decontrolled price will be reviewed with you at a meeting to be scheduled soon.

Defendant's Exhibit 8. Such a proposal is consistent with a renegotiated price under Section 7.5 of the contract and is further evidence that Section 105(b)(3) was not the applicable contract price but was in fact a ceiling price.

While Moncrief argues the seller never agreed to this new price, it is undisputed that a de facto price redetermination did occur. If § 105(b)(3) had governed, such a redetermination would have been unnecessary. The recent vintage of the plaintiffs' argument is further evidence that the price ceiling does not apply to the contract.

Finally, Moncrief's own actions are inconsistent with the current argument that the § 105(b)(3) ceiling price should apply. As recently as August 12, 1993, shortly before this litigation began, Tex Moncrief wrote to defendant WBIPC, "Moncrief's Contract Price is $3.845/MMBTU plus production tax reimbursement." Therefore, the Court concludes that the unambiguous language of Section 7.4 was intended to apply to "area rates" and not to the NGPA's price ceiling found in § 105(b)(3).

## B. The Applicable Contract Price After Deregulation.

■ Plaintiffs have urged that the contract did not provide for a fall in the contract price following deregulation, and, as a result, that the contract price remains at the highest regulated price. However, even if a gas contract does not explicitly provide for a lowering of a contract price, it is implicit in a price redetermination clause like that found in Section 7.5. *See, Prenalta Corp. v. Colorado Interstate Gas,* No. C89–1010–B (Brimmer, C.J.), *rev'd on other grounds,* 944 F.2d 677 (10th Cir.1991); *Questar Pipeline Co. v. Grynburg, et. al.,* No. 92–CV–265–J (Johnson, C.J.) and *PG & E Resources Co. v. Questar Pipeline Co.,* No. 93–CV–063–J (Johnson, C.J.). Moreover, courts have also held that in gas purchase contracts, the escalated base contract price governs when deregulation occurs and the parties have failed to redetermine a new contract price. *E.g., Colorado Interstate Gas v. Martin Exploration Management Corp.,* No. 85–CV–0399 (Dist.Ct.El Paso County, Colo. Dec. 15, 1988).

In the instant case, following deregulation in 1985, the parties did apply a new contract price which the Court assumes was near the market price. Although the plaintiffs claim that WBIPC "unilaterally" lowered the contract price following deregulation, it is undisputed that the WBIPC paid a new, albeit lower, price beginning on January 1, 1985, the date of deregulation. It is also undisputed that Moncrief did not suggest that the regulated price should apply until many years later. While this may not have been the ordered renegotiation contemplated by Section 7.5, it is still evidence that the regulated price no longer applied. This course of conduct is further evidence that the applicability of the regulated price ends with regulation and that the de facto negotiated price should govern absent a higher renegotiated price, at least until the seller under Section 7.5 of the contract requested a renegotiation of the price. Such a request did not occur until the Moncrief letter to WBIPC on August 9, 1993. In trial if it appears that there was a waiver, accord and satisfaction or laches on the part of the plaintiffs, it would appear that this series of accepted payments was in the nature of the voluntary payments doctrine recognized by the Tenth Circuit in *Prenalta*. Such an occurrence would mean that the price from August 9, 1993 until the end of the contract will have to be established by the evidence of the parties at trial.

### IV. Moncrief's Share of the Contractual 12,000 Mcf Minimum

 The next contractual provision that the parties dispute is Section 3.2, which provides for the minimum purchase amount under the contract. The applicable language states:

> In the event Seller and partners develop more than 12,000 Mcf per day of residue gas available for sale to Buyer from the lands dedicated hereunder, Buyer shall not be obligated to purchase and pay for such volumes in excess of 12,000 Mcf per day.

Plaintiffs argue that this provision requires the defendants to purchase 12,000 million cubic feet (Mcf) per day from the Moncriefs alone. Alternatively, the plaintiffs argue that the defendants should be required to purchase the Moncriefs' proportional amount of the minimum 12,000 Mcf which includes the portions allotted to other sellers who are no longer selling.

Defendants, for their part, argue that the minimum purchase amount found in Section 3.2 applies to the whole Powell II Unit and that Moncrief is only one of several sellers who together account for the 12,000 Mcf minimum sale. Defendants argue that the plaintiffs' position is inconsistent with both the parties' actions and the defendants' capacity for gas when the contract was signed.

 Again, the Court first looks to the language of the contract to determine the intentions of the parties. *State v. Pennzoil, supra.* The Court examines the disputed language to determine if it is ambiguous. *True Oil Co. v. Sinclair Oil Corp.*, 771 P.2d 781, 790 (Wyo.1989). After considering the parties' use of the words "Seller" and "Seller and partners," the Court concludes that a plain reading of the language dispenses with Moncrief's primary argument but not his alternative argument.

 Plaintiffs' argument that the word "partners" refers to Tex Moncrief is difficult to reconcile with the contract's clear definition of W.A. Moncrief as the "Seller." If Tex Moncrief was indeed an equal partner with his father, the contract would have more likely referred to both of them as "sellers" rather than "Seller and partners" or at least "partners" would have been defined alongside the definition of "Seller." [13] Both the plural and lower case form of "partners" also suggest that it is a reference to a general group rather than an individual person known at the time of the contract. Furthermore, the Court finds it significant that Tex Moncrief never even signed the disputed contract, nor was there a space for him to sign it. Thus, Moncrief's assertion is damaged

---

**13.** See exhibits 21–26 to Defendants' Reply to Plaintiff's Motion for Summary Judgment which are copies of six contracts between MDU and other interest owners in the Powell II Unit. Each of these contracts has "Seller and partners" language identical to the Moncrief contract.

both by what the contract says and what it doesn't say.[14] Therefore, the Court must reject Moncrief's first argument that the "partners" referred to in the contract was Tex Moncrief.

The plain language of the contract suggests that the "Seller", together with unnamed "partners", would sell a total of 12,000 Mcf daily to the WBIPC. The undisputed evidence before the Court shows that there were working interest owners, besides W.A. Moncrief, in the Powell II Unit, for whom Woods Petroleum managed the unit as operator. Woods Petroleum Corp. letter, Jan. 20, 1977. Such owners are often considered partners or joint venturers. *See Auster Oil & Gas, Inc. v. Stream*, 835 F.2d 597, 605 (5th Cir.) *cert. denied*, 488 U.S. 848, 109 S.Ct. 129, 102 L.Ed.2d 102 (1988) (general partner in working interest had authority to represent other operators limited partners and non-operating interests in litigation) and *Branch v. Mobil Oil Corp.*, 788 F.Supp. 539, 540 (W.D.Okl.1992) (court concurring with plaintiff's contention that working interest owners are partners or joint venturers). Because such a determination is possible through an examination of the contract language, the Court will not consider extraneous evidence which contradicts its plain meaning. Wyo. Stat. § 34–2–202 (1975 Supp.).

■ Moncrief's alternative argument, that he should be able to sell amounts no longer provided by other sellers, up to a daily limit of 12,000 Mcf, is more credible. Section 3.2 of the contract provides that the Buyer is obligated to purchase at least 12,000 Mcf from the "Seller and partners."

Unlike the plaintiffs' first argument, which was answered by the clear language of the contract, the plaintiffs' second argument raises an ambiguity in the language of the contract. The contract provides that the Buyer shall be obligated to purchase at least 12,000 Mcf from the "Seller and partners," but it does not provide for what should occur when the "partners" change or cease to exist, or who those partners are. For example, are the partners the unit agreement signatories,

or someone else? A contract is ambiguous when there is language "which is obscure in its meaning because of indefiniteness of expression." *Farr v. Link*, 746 P.2d 431, 433 (Wyo.1987). While the plaintiffs' interpretation is a credible one it is not the only possible interpretation. The Court finds that the contract is ambiguous on the issue of how the 12,000 Mcf minimum should be apportioned upon a change in the partnership. The Court may consider extraneous evidence on this issue but neither party has provided any such evidence except Tex Moncrief who says "partner" means him, which the Court doubts.

The Court concludes that there is a question of material issue of fact as to whether the defendants are required to purchase from Moncrief more than W.A. Moncrief's original proportionate share of the 12,000 Mcf of gas or whether the defendants' agreements with other producers alter this minimum. Plaintiffs' Motion for Summary Judgment on this issue is **DENIED.**

### V. Gas Acquired from Sources Outside the Lands Dedicated to the Contract

■ Defendants also dispute their obligation to pay for gas that the seller piped into the area to maintain pressure in the field. According to the defendants, the instant contract is a "dedication contract" which only requires them to purchase gas produced from the land dedicated to the contract and not gas piped in from other areas. See Section 1.1 of the contract entitled "commitment." It appears that during the operation of the Powell II Unit, the operators of the unit saved and reinjected gas produced by the field, and also purchased and injected approximately 17.6 Bcf of other gas from other fields, on which severance taxes have already been paid. Oil & Gas Cons. Comm'n. Order, January 7, 1994. The Commission has determined that the first 17.6 Bcf of gas produced during blow-down of the Powell II Unit shall be considered as outside substances produced and injected during unit operations.

---

**14.** The Court notes that without independent evidence to support his claim against his father's estate, Wyoming's dead man's statute prohibits

him from testifying about his interest. Wyo.Stat. § 1–12–102. Plaintiff has yet to supply this Court with such evidence.

Section 1.1 also states, "Subject to the further terms and provisions of this Agreement ..." The relevant "further terms and provisions" are found in Section 3.1 of the contract that clearly speaks to the issue of injected gas.[15] Section 3.1 states that, subject to quantity limitations of Section 3.2, "Buyer agrees to purchase, receive and pay for the daily quantity of gas *which is physically available to Buyer* at the delivery point on each day of the term hereof." (Emphasis added). This language is not complex. It states in clear terms that the Defendant is required to purchase the minimum daily amount available at the delivery point. There is no exception for injected or make-up gas.[16] The Count finds that this language is unambiguous and that it requires the defendants to purchase, subject to the contractual quantity limitations, the minimum amount of gas offered at the delivery point, regardless of whether the gas is make-up gas or not. *See, True Oil Co. v. Sinclair Oil Corp.,* 771 P.2d 781, 790 (Wyo.1989) (if the language of a contract is clear and unambiguous then it governs the parties' intent). The injection of gas from outside sources is a common procedure to maintain pressure within a unit. The parties to this contract were experienced gas producers, who were surely aware that one day the make-up or injection gas would be produced during the blow-down of the field. They made no provision excepting such gas from the contract and used the words "which is physically available to Buyer at the delivery point." The make-up gas is obviously available physically at that point and the buyer should not receive a windfall by not having to pay for the injected gas.

■ WBIPC has recently submitted evidence to the Court that in the contract for purchase of the make-up gas from Mountain Fuel Supply Company, the seller reserved the "first option to purchase part or all of the available volume." That option would arise "If, at any time Buyer (Woods Petroleum) no longer needs the gas purchased under this agreement, and all or part of such gas is available for sale." Whether or not Moncrief was a party, or a silent partner, to the purchase, or has ratified its terms and conditions or otherwise assented thereto, does not appear from this record. Neither has it been shown that the present operator has notified the successor to Mountain Fuel of the availability of this gas. It would seem to the Court that the determination of the Moncrief share of the 12,000 Mcf per day would depend upon whether or not Moncrief is bound by this option and whether the Mountain Fuel successor desires to exercise its option. That all would appear to be a factual matter to be decided by the Court on trial of the case.

## VI. Defendants' Repudiation of the Contract

■ In Tex Moncrief's Second Amended Complaint he alleges that WBIPC repudiated the instant contract on November 1, 1993 by refusing to purchase any more gas. One of the few undisputed terms to the contract was its length—it will not expire until July 6, 1996. Defendants' Answer to the Second Amended Complaint does not dispute the merits of this allegation and only asserts that Tex Moncrief has not been injured because he is not the real party in interest.

Plaintiffs claim damages for the difference between the applicable contract price and the later market price at which the gas was sold by Moncrief. The applicable contract price is a point of much contention, because the plaintiffs argue that either the Section 105(b)(3) price or the NGPA's last regulated price governs. These two applicable prices are $6.371 or $3.845 MMBTU and tax reimbursement, respectively.

Plaintiffs' argument is contrary to the finding of this Court and others that, despite the

---

**15.** Injected gas is natural gas contained in a facility for storage and sometimes inserted in a reservoir to maintain pressure. *See, Arkla v. United States,* 592 F.Supp. 502 (W.D.La.1984), *rev'd and remanded,* 765 F.2d 487, *reh'g denied,* 772 F.2d 904 (5th Cir.1985), *cert. denied,* 475 U.S. 1064, 106 S.Ct. 1374, 89 L.Ed.2d 601 (1986).

**16.** Make-up gas is natural gas that has been previously paid for by the purchaser, but not actually received. *See,* Williams and Meyers, *Oil and Gas Law.* Vol. 8, p. 607.

fact the contract does not provide for a reduction in the contract price, the applicability of the last regulated price ends with regulation. *See, Prenalta, supra* and *Colorado Interstate Gas Co., supra*. Although the Court recognizes that the plaintiffs may have suffered damages from the WBIPC's repudiation, the Court has rejected the plaintiffs' proposal for the applicable contract price in light of the foregoing analysis and the total deregulation that occurred on January 1, 1993. *See,* Natural Gas Wellhead Decontrol Act of 1989, Pub.L. 101–60, July 26, 1989, 103 Stat. 157.

Therefore, the Court rules that the parties must submit their evidence on the proper measure of damages in light of the Court's ruling on the issues discussed herein.

### Conclusion

Based on the analysis above, the Court concludes that Section 105(b)(3) of the Natural Gas Policy Act did not set a "just and reasonable area rate" applicable to the contract and that the application of regulated prices ended with deregulation in 1985. The Court further concludes that questions of material fact exist concerning the defendants' affirmative defenses of waiver, accord and satisfaction and laches, as well as the proportionate amount of gas that WBIPC is required to purchase and the amount of damages owed to the plaintiffs.

Therefore, it is **ORDERED** that the Defendants' Motion for Summary Judgment on its affirmative defenses be, and the same hereby is, **DENIED**; it is further,

**ORDERED** that the Plaintiffs' Motion for Summary Judgment that § 105(b)(3) of the Natural Gas Policy Act is the applicable price under the contract be, and the same hereby is, **DENIED** and the Defendants' Motion for Summary Judgment on the same issue be, and the same hereby is, **GRANTED**; it is further,

**ORDERED** that the Plaintiffs' Motion for Summary Judgment that Section 102 of the Natural Gas Policy Act set the applicable contract price after deregulation be, and the same hereby is, **DENIED** and the Defendant's Motion for Summary Judgment on the

same issue be, and the same hereby is, **GRANTED**; it is further,

**ORDERED** that the Plaintiffs' Motion for Summary Judgment on the issue of the amount of gas the defendant is required to take be, and the same hereby is, **DENIED** and the Defendants' Motion for Summary Judgment be, and the same hereby is, **GRANTED IN PART**; it is further,

**ORDERED** that the Plaintiffs' Motion for Summary Judgment on the issue of make-up gas be, and the same hereby is, **GRANTED** and the Defendants' Motion for Summary Judgment on this same issue be, and the same hereby is, **DENIED**; it is further,

**ORDERED** that the Plaintiffs' Motion for Summary Judgment on the issue of the defendants' repudiation of the contract be, and the same hereby is, **GRANTED**; it is further,

**ORDERED** that the parties' Motion for Summary Judgment on issues not explicitly decided by this order be, and the same hereby are, **DENIED**.